[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15590

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 2, 2011
JOHN LEY
CLERK

D. C. Docket No. 07-00243-CV-3-LAC-EMT

WYON DALE CHILDERS,

Petitioner-Appellant,

versus

WILLIE L. FLOYD,
Warden- Glades Correctional Institution,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 2, 2011)

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, CARNES,
BARKETT, HULL, MARCUS, WILSON, PRYOR, MARTIN, and BLACK,
Circuit Judges.

TJOFLAT, Circuit Judge:

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2241, et seq., requires federal habeas courts to defer to a state court's "adjudication on the merits" of a habeas petitioner's claim. When a state court has ruled on the merits of a petitioner's claim, that adjudication cannot be disturbed unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Today, we are called on to define what it means to render an "adjudication on the merits."

Petitioner Wyon Dale Childers appeals the district court's order denying his petition for a writ of habeas corpus. He claims that the courts of the State of Florida violated his rights under the Sixth Amendment's Confrontation Clause[1] when they prevented him from cross-examining the State's key witness regarding two topics he claims established the witness's motive to lie. Before this en banc court, Childers contends that the Florida District Court of Appeal's decision[2] denying his claim is owed no deference under AEDPA because it analyzed Childers's claim under a Florida Rule of Evidence rather than the United States Supreme Court's Confrontation Clause jurisprudence. He further argues that,

---

[1] This right has been incorporated against the States through the Due Process Clause of the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 405–06, 85 S. Ct. 1065, 1067–69, 13 L. Ed. 2d 923 (1965).

[2] Childers v. State, 936 So. 2d 585 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam).

whether analyzed <u>de novo</u> or under AEDPA's deferential standard, his confrontation rights were denied.

Part I sets out the facts of the case, the proceedings in the trial court, Childers's appeal to the District Court of Appeal, and his proceedings in federal court. Part II determines that the Florida District Court of Appeal's adjudication was on the merits of Childers's claim. Part III explains why this decision on the merits was neither contrary to, nor an unreasonable application of, Supreme Court Confrontation Clause precedent. Part IV concludes.

I.

A.

This case stems from the corrupt purchase of land—the Pensacola Soccer Complex—by the County Commission of Escambia County, Florida, in 2001. At the time of the purchase, Childers was serving as a county commissioner for Escambia County—the equivalent of a county legislator. Serving with him on the Commission was Willie Junior. The Soccer Complex was owned by Joe Elliot. As set out by the State in Childers's trial, Childers allegedly bribed Junior in exchange for his vote to approve the purchase of the Soccer Complex; following the completed purchase, both Childers and Junior would receive kickback payments from Elliot to compensate them for their votes.

3

In 2002, Childers was indicted by an Escambia County grand jury for one count each of money laundering, bribery, and unlawful compensation or reward for official behavior. Junior and Elliot were also indicted for their roles in the kickback scheme.

Unwilling to risk a trial, Junior entered into a plea agreement with the State. Under the terms of the plea agreement, Junior pled <u>nolo contendere</u> to numerous charges, including bribery, extortion, grand theft, and racketeering. In exchange for his testimony, the State Attorney granted him immunity for any other offenses committed by him and agreed to recommend a sentence of only 18 months in prison; Junior otherwise faced a maximum sentence of 125 years. Regarding his testimony, the agreement provided that

> if any information Junior provides is determined to be false, this grant of immunity is withdrawn and, additionally, the State may prosecute Junior for offenses relating to the giving of false statements or perjury. . . .
> . . . .
> The parties agree that the State may revoke this agreement if, in the sole discretion of the State Attorney, any of the following circumstances have occurred:
>> A. Junior's refusal to cooperate as provided in this agreement;
>> B. Junior's statements or testimony are incomplete or untruthful;
>> C. Junior failed to comply with any of the terms of this agreement . . . .

Under the plea agreement, Junior waived his right to withdraw his plea of <u>nolo</u>

4

contendere.  It would remain "in full force and effect" even if the State revoked its agreement.  Junior could only challenge his sentence on appeal.

Pursuant to the plea agreement, Junior met several times with the State Attorney's investigators.  During this time period, Junior's statements remained consistent.  Junior gave testimony consistent with his prior statements at Elliot's trial, which occurred in December 2002, several months before Childers's trial date.  Following the jury trial, Elliot was acquitted.

After the Elliot acquittal, Junior met with the State Attorney's investigators twice in January 2003.  During these meetings, Junior supplemented his statements regarding Childers's actions in four ways.  First, Junior testified at the Elliot trial that Childers communicated the terms of the kickback by writing "100/100" on a notepad.  Under Junior's initial version of events, Childers remained silent, but Junior assumed that "100/100" meant that each of them would receive $100,000 from Elliot after the County approved the purchase.  In the January 2003 meetings, however, Junior told the  investigators that Childers explicitly articulated the bribe's terms in addition to passing the 100/100 note.  According to Junior, Childers told him, "[I]f the soccer complex goes through, it will be a hundred for you and a hundred for me."

Second, Junior altered the time in which he and Childers had the 100/100

5

discussion. Under the previous account, this discussion occurred after the County Commission voted to seek an appraisal of the Soccer Complex, but before the Commission voted to purchase the property. Under the new version of events, Junior claimed that this discussion occurred before the appraisal vote.

Third, Junior also added that, some time after the 100/100 discussion, Childers told Junior that he was going to send Elliot to see Junior regarding the Soccer Complex purchase. This incident was never mentioned during Junior's prior meetings with the State Attorney's investigators or at Elliot's trial.

Fourth, Junior amended testimony regarding a large cooking pot filled with money. In his initial version of events, Junior testified that Childers silently gave him a large cooking pot filled with money; Childers offered no verbal commentary on the transaction. In his January 2003 statement, however, Junior maintained that, when giving Junior the pot of money, Childers stated that he took $25,000 from the pot. Junior subsequently amended this statement; he claimed that Childers told him he first took $10,000 from the pot and then took another $25,000 from the pot. In this third version, Junior also added that Childers stated that he was "sick and tired of not being able to get three votes" for the Soccer Complex purchase. Again, Childers was mum according to Junior's first iteration of testimony.

Upon hearing these new statements, the State Attorney attempted to revoke

6

Junior's plea agreement, filing a Notice of Revocation of Terms of Plea Agreement

(the "Notice of Revocation") with the state court on February 18, 2003.[3] The

Notice of Revocation charged that Junior "fail[ed] to cooperate fully . . . and

ma[de] incomplete or untruthful statements." According to the State,[4] the new

statements in January 2003 indicated that Junior "provided incomplete and/or

untruthful answers on previous occasions," including at the Elliot trial.

On March 13, 2003, the trial court[5] held a hearing regarding the Notice of

Revocation. At that hearing, the State maintained that Junior violated the plea

agreement because he withheld information prior to his January 2003 interviews.

These omissions, the State argued, hurt the State's prior prosecutions and would

hurt Junior's credibility in Childers's upcoming trial.

Although the plea agreement provided the State Attorney with sole

discretion to revoke Junior's plea agreement, the trial court refused to permit the

---

[3] The State informed Junior verbally on January 24, 2003, and in writing on February 4, 2003, that it planned to revoke his plea agreement.

[4] From hereon, all references to the "State" refer to the State Attorney and the Assistant State Attorneys who prosecuted Childers's case. State Attorney Curtis Golden and Assistant State Attorney John Simon signed the Notice of Revocation on the State's behalf. Golden, Simon, and Assistant State Attorney Tiffany Sims represented the State at the March 13 hearing and at Childers's trial. All statements attributed to the State were made by one of these three individuals.

[5] All trial court proceedings—the March 13 hearing regarding the Notice of Revocation, the Elliot trial, and Childers's trial—were held in the Escambia County circuit court before Judge Jere Tolton.

State to revoke the plea agreement.[6]  Finding that Junior had substantially complied with the plea agreement, the court noted three key features of the plea agreement and Junior's performance thereunder.  First, the plea agreement did not specify that Junior needed to "testify truthfully in a certain way so as to be clear as to exactly what benefit the State expect[ed] to receive."  Second, the January 2003 statements were not made under oath and did not "indicate anything other than [Junior's] willingness to assist the State in accordance with the plea agreement."  Finally, the State, in a motion relevant to Childers's prosecution, "acquiesced that Mr. Junior ha[d] consistently maintained and testified to certain material evidence."[7]

After the trial court denied the State's request to revoke Junior's plea agreement, the State filed an information against Childers on March 24, 2003, that superceded the 2002 indictment.  The information alleged the same offenses, but substantiated those charges with Junior's most recent version of events.  After Childers objected to portions of the information, the State filed an amended information on March 31, 2003.

B.

---

[6]  We refer to the trial court's ruling on the State's motion to revoke Junior's plea agreement as the "March 13 ruling."

[7]  The motion referred to by the trial court was the State's Objection to Defendant's Motion to Exclude Testimony of Willie Junior, filed by Assistant State Attorney John Simon on March 11, 2003.

With Childers's trial approaching, the State filed a motion in limine on March 20, 2003, to prevent Childers from "mentioning, arguing, or introducing into evidence" the Elliot acquittal. The verdict was, in the State's view, irrelevant under Florida Evidence Rule 90.401,[8] or more prejudicial than probative under Florida Evidence Rule 90.403.

Childers's March 27 response explained that he planned to use the Elliot acquittal and the Notice of Revocation to impeach Junior—who would be the State's star witness—on cross-examination. According to Childers, these events were relevant to assess Junior's

> credibility, his motivation, incentive, [and] bias to testify in this case because of the not guilty verdict in the Elliot Case. . . . It is the testimony in this case which will form the final basis of his "cooperation" pursuant to his plea agreement . . . . It behooves Junior, in order to reap the maximum benefits of his "cooperation agreement," to make the State's case.
> . . . .
> In order to reap the full benefits of his plea agreement with the State, Junior must testify in a manner most favorable to the State and atone for his lack of credibility which lead [sic] to Elliot's acquittal.

On March 28, Childers notified the State and the trial court that he also intended to introduce statements by the State from the Notice of Revocation, the

---

[8] Florida's Evidence Code is codified in Fla. Stat. § 90.101, et seq. This opinion will refer to any rule from Florida's code as a "Florida Evidence Rule."

March 13 hearing on the Notice of Revocation, and the Elliot case.[9] That same day, Childers also filed a motion in limine to exclude the March 13 ruling. Childers argued that the court's ruling would be "irrelevant," "would serve as improper bolstering" of Junior's credibility, and that the unfair prejudice would "overwhelmingly outweigh" the ruling's probative value. Taken together, these two filings show that Childers "sought to have the jury hear only the State's accusations that Junior's later statements were not truthful and complete, and not a judicial ruling finding the State's accusations without merit." Childers v. State, 936 So. 2d 585, 590 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam).

The trial court held a hearing on the motions in limine on March 31. There, Childers's counsel clarified how the Elliot acquittal affected Junior's testimony:

> [Junior's] 0 for 3 in terms of testifying before juries,[10] so he's come up with a better story because that Elliot not guilty verdict in December made him realize he wasn't going to get a conviction in W.D. Childers either, and what did that mean? That meant that his sentence was going to be worse because he didn't produce for the State.

The verdict was therefore relevant to Junior's state of mind. Childers maintained that any potential prejudice could be remedied by a limiting instruction. Counsel

---

[9] As stated in note 4, supra, State Attorney Curtis Golden and Assistant State Attorney John Simon signed the Notice of Revocation on the State's behalf. Golden, Simon, and Assistant State Attorney Tiffany Sims represented the State at the March 13 hearing and at Childers's trial.

[10] The three juries referred to are the grand jury that indicted Childers, the Elliot jury, and the jury for another prosecution related to this case.

explained that he would use the Elliot acquittal while cross-examining Junior after the verdict was admitted into evidence, either via judicial notice or a live witness.

As an issue bearing on "[i]nterest, motive, bias, [and] animus," Childers's counsel claimed that Childers's Sixth Amendment right to confrontation required the court to permit the jury to hear this evidence. In making this argument, Childers's counsel cited one of the leading Confrontation Clause cases, Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).

Childers's counsel's explanation regarding the Notice of Revocation was not similarly detailed. The State's comments within the Notice of Revocation and at the March 13 hearing were, according to Childers, admissible hearsay statements under the "party opponent" exception, with the State of Florida as Childers's opposing party. Counsel did not explain how, procedurally, he would admit the State's statements from the Notice of Revocation or at the March 13 hearing into evidence.[11]

Regarding the March 13 ruling, Childers's counsel agreed that the trial court's bottom-line ruling—that the State could not revoke Junior's plea agreement—should come into evidence alongside the Notice of Revocation. The

_____

[11] As discussed in part I.C, infra, Childers explained in his brief to the District Court of Appeal how he planned to use the State's comments in the Notice of Revocation and at the March 13 hearing.

11

bare-bones ruling would prove that Junior's plea agreement was still in effect. But, argued Childers's counsel, the jury should not hear the trial court's explanation of why it denied the State's motion to revoke Junior's plea agreement. Counsel claimed that the trial court's explanation would improperly provide the jury with the trial judge's opinion of Junior's credibility.

The State argued that the Elliot acquittal was irrelevant. It urged the trial court to exclude the Elliot acquittal because "prior verdicts ha[ve] the inevitable tendency of causing the jury in the present case to defer [to] decision[s] made in a previous order, and thus delegate the uniquely nondelegatable [sic] duty of reaching its own independent conclusions." Regarding the Notice of Revocation, the State's position was that, if Childers were allowed to admit the Notice of Revocation, it should be able to admit the trial court's March 13 ruling.

The trial court granted the State's motion to exclude the Elliot acquittal. It ruled that the "prejudice would outweigh any probative value." Before ruling on the Notice of Revocation and the March 13 ruling, the court opined that if Childers used the Notice of Revocation, the March 13 ruling would also be admitted into evidence. This did not come to pass, however, because the trial court found both the Notice of Revocation and the March 13 ruling irrelevant to the charges against Childers and therefore inadmissible.

12

Childers's trial began on April 1, 2003. As expected, Junior's testimony was the State's principal evidence against Childers. As described by the Florida District Court of Appeal, Junior's testimony was generally consistent with his revised statements made in January 2003.

> Junior testified that, before the payment, [Childers] wrote out the 100/100 note and said he and Junior would each receive $100,000 for voting for the purchase of the land. Junior also testified that [Childers] gave Junior a cooking pot of money, purportedly including $100,000, less $25,000 which [Childers] retained for some loan repayments and other considerations. The jury heard other evidence related to [Childers's] alleged bribery of Junior, including a $40,000 payment from [Childers] to Junior by cashier's check that occurred when Junior traded some of the currency back to [Childers] for a check. Junior testified that he also received separate checks from [Childers] in the amounts of $7,000, $10,000, $11,000, and $3,000, respectively. Junior acknowledged that [Childers] wrote notations on the checks that the payments were loans to Junior, and that he ultimately signed a promissory note in the principal amount of $87,000 in favor of [Childers]. Junior testified, however, that [Childers] never attempted to obtain repayment or security and that [Childers] stated he would not attempt to collect the purported loans.

Childers, 936 So. 2d at 590–91.

Childers's trial counsel cross-examined Junior for approximately ten hours. The elements of his plea agreement were fully fleshed out: Junior decided to cooperate with the State after learning that he was facing 125 years in prison for his crimes; his agreement called for a maximum of eighteen months; in exchange for this treatment, Junior promised to provide truthful information; if the State

13

believed that he provided false information, it would revoke his agreement.

Junior was also confronted with his prior inconsistent statements. Through these questions, the jury learned exactly when Junior changed the various portions of his testimony. The jury did not learn, however, about the Elliot acquittal, the Notice of Revocation, or how those matters might have affected Junior's motive to testify.

On April 10, 2003, the jury found Childers guilty of one count of bribery and one count of unlawful compensation for official behavior, but found him not guilty of the money laundering charge. Childers moved for a new trial, arguing in part that prohibiting the jury from learning about the Elliot acquittal and the Notice of Revocation violated his confrontation rights under the Sixth Amendment, again citing Davis v. Alaska. The trial court denied the motion and sentenced Childers to forty-two months of incarceration.

C.

Childers appealed his conviction to the District Court of Appeal. His brief to that court presented one issue: whether "the trial court abused its discretion when it denied [Childers] his Sixth Amendment constitutional right to fully cross-examine [the] key prosecution witness to expose his bias or motive to be untruthful." He argued that both the Elliot acquittal and the Notice of Revocation

14

were necessary to expose Junior's biases. In addition, Childers explained in detail the relevance of the State's comments in the Notice of Revocation and at the March 13 hearing. These comments would show that the State believed that its key witness was a liar. According to Childers's brief, "[t]he only method of proof to establish this fact was to present to the jury not only the State's notice outlining what it considered undermined Junior's credibility and [proved] damning to its case, but its own statements condemning Junior and his lack of credibility."

In the body of Childers's argument, he cited the relevant precedent from the United States Supreme Court, Davis v. Alaska; Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); and Olden v. Kentucky, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) (per curiam). He also argued that barring this cross-examination violated Florida Evidence Rule 90.608(2), which allows any party to attack a witness's credibility by "[s]howing that the witness is biased."

The State's answer brief countered that excluding the Elliot acquittal and the Notice of Revocation were within the trial court's discretion to reasonably limit cross-examination. For this proposition, the State cited Van Arsdall, 475 U.S. at 679, 106 S. Ct. at 1435. According to the State, it was reasonable to exclude these pieces of evidence because they were irrelevant and extremely prejudicial.

15

The Elliot acquittal, the State argued, could not have affected Junior's testimony because the plea agreement was not contingent on Elliot's conviction. Moreover, admitting the verdict would improperly influence the jury's deliberations because Childers's jurors might defer to the Elliot jury's decision to acquit. Regarding the Notice of Revocation, the State contended that it was not relevant for any legitimate issue. The Notice of Revocation did not, according to the State, establish that Junior had lied. It also could not have influenced Junior's January 2003 embellishments because the State did not move to revoke the agreement until February 2003. The Notice of Revocation was only relevant "to show the prosecutor's personal opinion that Junior had lied in the past" and would essentially require Childers to "call the prosecutor to testify as to his opinion." Such testimony would be impermissible under Florida's evidence rules, which prohibit testimony regarding personal opinion of truthfulness. Cf. Fla. Stat. § 90.405(1) (permitting reputation evidence).

The District Court of Appeal ruled that the trial court properly excluded Childers's evidence and affirmed Childers's conviction.[12] The court's opinion did

---

[12] A three-judge panel was initially assigned to Childers's appeal. Childers v. State, 936 So. 2d 619, 620 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam). The circulated panel decision, by a 2-1 vote, would have reversed Childers's conviction. Id. This panel decision was never released, however. Before the opinion's proposed June 22, 2005 release date, a majority of the judges of the District Court of Appeal voted to hear the case en banc, as per Fla. R. App. P. 9.331(a). Id.

not, however, cite the Confrontation Clause or refer to the cases cited by Childers. The court, applying an abuse of discretion standard of review, analyzed his claims under Florida Evidence Rule 90.403, which provides that "relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." Fla. Stat. § 90.403.

Turning first to the Notice of Revocation, the court disagreed with the trial court and found that the Notice of Revocation and the March 13 ruling were relevant. Childers, 936 So. 2d at 592. The court agreed with the trial court's outcome, however; the Notice of Revocation and the March 13 ruling were excludable under Florida Evidence Rule 90.403 because the unfair prejudice substantially outweighed the probative value. Id. at 593.

The court noted that the Notice of Revocation had limited probative value. First, the March 13 ruling undercut Childers's argument. Childers wanted to use the Notice of Revocation to suggest that Junior was lying. The March 13 ruling—which the court found would necessarily be admissible if the Notice of Revocation was introduced—suggested instead that Junior had told the truth in compliance with his plea agreement. These two inferences would cancel each other out, and therefore negate much of the alleged probative value. Id. at 594.

17

Second, the Notice of Revocation would not have introduced significantly more facts into the record because the jury had already learned that the State could revoke Junior's plea agreement if he did not testify truthfully. Id. Finally, Childers's cross-examination thoroughly exposed Junior's motive to cooperate. Id. at 594–95.

This minimal probative value paled in comparison to the prejudice to the State. According to the court:

> The admission of the notice would have been similar to admitting an opinion by the State concerning Junior's character, truthfulness and credibility. Such opinion testimony regarding a witness' reputation for truthfulness is clearly inadmissible. . . . In our view, the type of testimony sought to be introduced by [Childers] was likely to distract the jury during their deliberations; improperly influence the jury's evaluation of Junior's veracity, where the credibility was a central issue; and prejudice the State's case with unreliable evidence.

Id. at 596.

Turning next to the Elliot acquittal, the District Court of Appeal was terser. The court ruled that the trial court did not abuse its discretion, noting that "[v]erdicts from other cases are generally inadmissible." Id. For this proposition, the court cited Secada v. Weinstein, 563 So. 2d 172 (Fla. 3d Dist. Ct. App. 1990), which barred admission of prior verdicts because "any information as to prior verdicts has the inevitable tendency of causing the jury in the present case to defer to decisions made in a previous one and thus to delegate the uniquely

18

non-delegable duty of reaching its own independent conclusions." Id. at 173.

The District Court of Appeal's per curiam opinion did not speak for all of the court's judges. Nine judges of the court wrote separate opinions concurring in or dissenting from the court's judgment. Several of these separate opinions, unlike the per curiam opinion, specifically referenced United States Supreme Court precedent concerning the Confrontation Clause. One opinion cited Van Arsdall for the proposition that Childers's claim was subject to harmless error analysis. Childers, 936 So. 2d at 599 (Thomas, J., specially concurring). Two opinions found that the Confrontation Clause required the trial court to permit cross-examination regarding the Notice of Revocation. Id. at 604–07 (Kahn, C.J., concurring in part and dissenting in part) (citing Davis, 415 U.S. at 316, 94 S. Ct. at 1110, and Olden, 488 U.S. at 232, 109 S. Ct. at 483); id. at 617–19 (Polston, J., concurring in part and dissenting in part) (citing Davis, 415 U.S. at 316–17, 94 S. Ct. at 1110); see also id. at 616 (Browning, J., concurring in part and dissenting in part) (concurring fully in Chief Judge Kahn's conclusion that the per curiam opinion violated Childers's "constitutional rights to confront his accuser," but not discussing the issue in depth "in the interest of brevity"). And yet another judge examined the confrontation issue, but found that the trial court properly excluded the Notice of Revocation and the Elliot acquittal. Id. at 615 (Benton, J., concurring

19

in part and dissenting in part) (citing <u>Davis</u>, 415 U.S. at 316, 94 S. Ct. at 1110).

Childers moved the District Court of Appeal for reconsideration, which the court denied. <u>Childers v. State</u>, 936 So. 2d 619 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam). The Florida Supreme Court declined Childers's petition to invoke the court's discretionary jurisdiction. <u>Childers v. State</u>, 939 So. 2d 1057 (Fla. 2006).

D.

On December 14, 2006, Childers filed a habeas petition with the United States District Court for the Southern District of Florida, which was transferred to the Northern District of Florida on May 31, 2007. Childers's petition raised the confrontation issue as his only ground for habeas relief. In his corresponding memorandum of law, Childers argued that the District Court of Appeal's decision was "'contrary to' clearly established Supreme Court law"; habeas relief was thus appropriate under 28 U.S.C. § 2254(d)(1). Mem. Supp. Pet'r's Habeas Corpus Pet. 16. Nowhere did Childers argue that the District Court of Appeal failed to render an adjudication on the merits of Childers's claim or that the federal district court should review the Florida court's ruling <u>de novo</u>.

The magistrate judge—"upon independent review" of Childers's claim—found no constitutional violation. In her Report and Recommendation, the

magistrate judge determined that "the excluded testimony would not have given the jury a different impression of Mr. Junior's credibility." The district court adopted in full the Report and Recommendation and denied habeas relief on September 19, 2008. That court also denied Childers's request for a certificate of appealability under 28 U.S.C. § 2253.

Childers sought and received a certificate of appealability from this court on one issue: "Whether the district court erred in finding that Childers' right to confrontation was not unconstitutionally curtailed." In his initial brief to the court, Childers conceded that AEDPA deference applied to the District Court of Appeal's decision: "Childers has met the deference standard set forth under 28 U.S.C. § 2254(d)(1) because the adjudication on the merits in State court proceedings of Childers' claim resulted in a decision that was contrary to clearly established federal law, as determined by the United States Supreme Court." Br. Pet'r-Appellant 17.

Following oral argument, this court, one judge dissenting, issued a decision granting Childers's request for habeas relief. Childers v. Floyd, 608 F.3d 776, 780, vacated, 625 F.3d 1319, 1320 (11th Cir. 2010). The majority's opinion first determined that AEDPA deference—that we cannot grant habeas relief unless the state court decision was "contrary to, or involved an unreasonable application of"

21

federal law—did not apply to the District Court of Appeal's decision. Id. at 789. In the majority's view, the Florida court did not adjudicate Childers's confrontation claim on the merits because it "analyzed the admissibility of the Notice [of Revocation] and the verdict only under the Florida rules of evidence, which are not conterminous with the Confrontation Clause such that a ruling based on the Florida rules of evidence is, ipso facto, a ruling on the Confrontation Clause." Id. at 789 n.6. De novo review was therefore the appropriate standard. Id. at 789.[13]

Applying de novo review, the majority found that Childers's right of confrontation had indeed been denied. Evidence of the Notice of Revocation and the Elliot acquittal would have, in the majority's view, explained why Junior changed his testimony. Id. at 792. This context "would have given the jury a different impression of his credibility." Id. at 793–94 (citing Van Arsdall, 475

---

[13] The majority's opinion in the vacated panel decision asserted that the magistrate judge reviewed Childers's Confrontation Clause claim de novo. Childers v. Floyd, 608 F.3d 776, 788 (11th Cir. 2010). The Report and Recommendation's language does not permit so certain a conclusion.

Nowhere in the Report and Recommendation does the magistrate judge state that she was, in fact, conducting de novo review. The Report and Recommendation instead describes the deference federal courts must afford the State courts under AEDPA regarding "adjudications on the merits" of the petitioner's claim. Nowhere does it state that de novo review is appropriate where the state court fails to render an adjudication on the merits. Instead, the Report and Recommendation states: "Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims." It was this "independent review" that the magistrate judge undertook; the magistrate judge did not find that the District Court of Appeal failed to render an adjudication on the merits of Childers's claim.

22

U.S. at 678, 106 S. Ct. at 1435).  After the majority found this error harmful, id. at 794, the district court's judgment was reversed and the case was remanded to the district court with instructions to issue the writ, id.

After voting to rehear this case en banc, we vacated the panel opinion and directed the parties to brief and argue the following issues:

> 1) Does the Florida appellate court's ruling on Florida Rule 403 in response to Childers's Confrontation Clause claim constitute an adjudication "on the merits" sufficient to grant the ruling deference under 28 U.S.C. § 2254(d)?  Address whether this argument is "waivable" and, if so, whether Childers waived it.
>
> 2) If not reviewed under § 2254(d) deference, was the exclusion of the Notice of Revocation and the Elliot acquittal from cross-examination a violation of Childers's Confrontation Clause rights?  Analyze this question in light of Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), and 28 U.S.C. § 2254(e)(1).
>
> 3) If reviewed under § 2254(d) deference, was the Florida appellate court's opinion an unreasonable application of clearly established federal law?

## II.

AEDPA limits a federal court's power to grant habeas corpus relief to state prisoners.[14]  Under 28 U.S.C. § 2254(d), we may not grant a habeas petitioner relief

with respect to <u>any claim that was adjudicated on the merits</u> in State

---

[14]  Because Childers filed his federal habeas petition after April 24, 1996, AEDPA governs our review.  Land v. Allen, 573 F.3d 1211, 1215 (11th Cir. 2009).

23

court proceedings unless the adjudication of the claim—

> (1) <u>resulted in a decision</u> that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) <u>resulted in a decision</u> that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  Today, we must decide whether the District Court of Appeal rendered an "adjudication on the merits" of Childers's Confrontation Clause claim.[15]

The concept of an "adjudication on the merits" is the corollary of the long-held requirement that a state prisoner first exhaust his claims in state court.  <u>See id.</u> § 2254(b)(1)(A) (requiring exhaustion of state court remedies); <u>Cone v. Bell</u>, ___ U.S. ____, 129 S. Ct. 1769, 1780, 173 L. Ed. 2d 701 (2009) (calling exhaustion of state remedies prior to seeking federal habeas relief a "longstanding requirement").  Federal-state comity underlies this policy; before asking the federal court to "correct" a state court's mistake, the petitioner must first give the state court an

---

[15]  In addressing whether the District Court of Appeal's opinion was an "adjudication on the merits," we do not decide whether Childers waived his right to argue that the court's decision was not an adjudication on the merits.  We note only that the Supreme Court has suggested that habeas petitioners can waive this issue.  <u>See</u> <u>Knowles v. Mirzayance</u>, ___ U.S. ____, 129 S. Ct. 1411, 1418 n.2, 173 L. Ed. 2d 251 (2009) ("[B]ecause Mirzayance has not argued that § 2254(d) is entirely inapplicable to his claim or that the state court failed to reach an adjudication on the merits, we initially evaluate his claim through the deferential lens of § 2254(d).").

opportunity to rule on the merits of his claim. Cone, 129 S. Ct. at 1780 ("When a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights." (quoting Coleman v. Thompson, 501 U.S. 722, 732, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991))).

Implicit in this scheme lies the possibility that the state court—presented with the petitioner's federal constitutional claim—may not rule on the merits of the petitioner's claim. E.g., Cone, 129 S. Ct. at 1784. In those instances, AEDPA deference—that we may not grant habeas relief unless the state court's decision was "contrary to" or an "unreasonable application of" federal law—does not apply and federal courts evaluate the petitioner's claims de novo. Id. (citing Rompilla v. Beard, 545 U.S. 374, 380, 390, 125 S. Ct. 2456, 2462, 2467, 162 L. Ed. 2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003)).

Faced with this possibility, the breadth of what it means to render an "adjudication on the merits" is of paramount importance. Decisions from this circuit and the United States Supreme Court have interpreted "adjudication on the merits" broadly. We have previously noted that § 2254 refers only to "decisions" and not to "opinions." See Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245,

25

1255 (11th Cir. 2002). As such, a summary adjudication—a state court decision denying a petitioner's claim without an accompanying statement of reasons—is an adjudication on the merits under AEDPA. Harrington v. Richter, ___ U.S. ____, 131 S. Ct. 770, 780, 784, 178 L. Ed. 2d 624 (2011); Wright, 278 F.3d at 1255. And, where the state court does explain its reasoning, that decision receives AEDPA deference even if the state court fails to cite—or is not even aware of—relevant Supreme Court precedent. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam).

Deference to the autonomy and dignity of the state courts underlies this broad definition of "adjudication on the merits." Deciding cases on the merits either with no explanation or using the language of state law is a common practice. State courts with busy dockets may choose to summarily deny claims they deem weak and instead focus on claims requiring greater thought. See Harrington, 131 S. Ct. at 784 ("The issuance of summary dispositions in many collateral attack cases can enable a state judiciary to concentrate its resources on the cases where opinions are most needed."). Similar constraints may lead courts to decide the merits of claims using state law, with which the state courts are likely more familiar. Cf. Early, 537 U.S. at 7, 123 S. Ct. at 364 (ruling that the state court decided the petitioner's claim on the merits even though it referenced only a

26

California rule of criminal procedure). Requiring detailed opinions would intrude on these state prerogatives. See Wright, 278 F.3d at 1255 ("Telling state courts when and how to write opinions to accompany their decisions is no way to promote comity."). Furthermore, to do so would be anomalous under the guise of a statute meant to give greater deference to state court decisions. See Renico v. Lett, ___ U.S. ____, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) ("AEDPA thus imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt." (citations and internal quotation marks omitted)); Wright, 278 F.3d at 1255 ("Requiring state courts to put forward rationales for their decisions so that federal courts can examine their thinking smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era.").

With these anchors in place, an "adjudication on the merits" is best defined as any state court decision that does not rest solely on a state procedural bar. See Jason Williams v. Allen, 598 F.3d 778, 796 (11th Cir. 2010) ("'A decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed.'" (quoting Blankenship v. Hall, 542 F.3d 1253, 1271 n.4 (11th Cir. 2008)); Wright, 278 F.3d at 1255–56 (same). In Harrington, the Supreme Court essentially defined the term as such. The Court

27

wrote: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits <u>in the absence of any indication or state-law procedural principles to the contrary</u>." 131 S. Ct. at 784–85 (emphasis added) (citations omitted).[16] Therefore, unless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petitioner's claim "is the same claim rejected" by the state court. <u>Early</u>, 537 U.S. at 8, 123 S. Ct. at 364. The District Court of Appeal clearly did not apply a procedural bar, and we may therefore presume that the court rendered an "adjudication on the merits."

Childers and the dissent argue that the District Court of Appeal did not, in fact, adjudicate Childers's Confrontation Clause claim. Rather, they argue that the state court misinterpreted Childers's claim, and responded to Childers's federal

---

[16] The dissent also quotes the subsequent sentence in <u>Harrington v. Richter</u>, ___ U.S. ____, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011), which reads, "[t]he presumption [that a state court decision is an "adjudication on the merits"] may be overcome when there is <u>reason to think some other explanation for the state court's decision is more likely</u>." <u>Id.</u> at 785 (emphasis added). This passage, particularly the underlined text, is not an invitation for federal courts to narrow the scope of state court actions deserving AEDPA deference; we should not expand the implications of this sentence unmoored from context. The case <u>Harrington</u> cites for this proposition, <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991), provides the proper context; <u>Ylst</u> dealt with a procedural bar, and not some more exotic explanation for the state's purported failure to adjudicate the petitioner's federal claim. <u>Id.</u> at 802–05, 111 S. Ct. at 2593–95.

28

question with a state-law-evidentiary answer.[17]  But the District Court of Appeal

did not misinterpret Childers's Confrontation Clause claim.[18]  Explaining why this

---

[17]  The dissent cites Espy v. Massac, 443 F.3d 1362 (11th Cir. 2006), where we suggested that AEDPA's deference should not apply where a state court addresses only one of the petitioner's two claims without any other language suggesting a summary adjudication of the unaddressed claim.  Id. at 1364–65.  In Espy, the petitioner challenged the admission of hearsay statements in his direct appeal in state court on the ground that admitting the testimony violated (1) a state evidence rule regarding hearsay, and (2) the Confrontation Clause.  Id. at 1364.  The state court rejected the petitioner's claims, but cited only the state evidence rule.  Id.  We found that this disposition was not an "adjudication on the merits" of the petitioner's Confrontation Clause claim, and therefore we reviewed that claim de novo.  Id. at 1365.

Our holding today necessarily overrules this portion of Espy.  As the Espy court noted, the applicable Confrontation Clause precedent considered whether "the statements at issue here carried with them sufficient indicia of reliability to bring them within a firmly rooted hearsay exception."  Id. at 1367.  The court found that the state court's application of its hearsay rule satisfied this standard, and therefore rejected the petitioner's claim.  Id. at 1368.  We face the same circumstance here, and, because we decide that the District Court of Appeal's opinion must receive AEDPA deference, Espy's contrary holding cannot stand.

The dissent also notes that the District Court of Appeal reviewed Childers's claim for an abuse-of-discretion, rather than de novo.  This distinction, the dissent proclaims, "clearly indicates that [the District Court of Appeal] was not adjudicating Childers's Confrontation Clause claim."  Regardless of the proper standard of review, Childers's brief to the state court invited the court to apply an abuse-of-discretion standard to his Confrontation Clause claim.  As quoted in part I.C, supra, his brief read: "the trial court abused its discretion when it denied [Childers] his Sixth Amendment constitutional right to fully cross-examine [the] key prosecution witness to expose his bias or motive to be untruthful." (emphasis added).  We cannot imagine a reason why AEDPA deference should not apply to a state court decision that uses legal standards advanced in the petitioner's brief to that court.

[18]  The dissent relies upon Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009), and Davis v. Secretary for Department of Corrections, 341 F.3d 1310, 1313 (11th Cir. 2003), for the proposition that we must apply de novo review when a state court has misinterpreted a habeas petitioner's federal claim.  Because we hold that the District Court of Appeal did not misinterpret Childers's Confrontation Clause claim, we need not address these decisions.

For the same reason, we have no occasion to expand upon Harrington's statement that "it may be presumed that the state court adjudicated the [petitioner's] claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  131 S. Ct. at 784–85 (emphasis added).  Unlike the dissent, we do not see "any indication" that the District Court of Appeal failed to adjudicate the merits of Childers's Confrontation Clause claim.

The dissent also makes much out of Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), where the Court reviewed the prejudice element of a claim for

is so first requires a brief explanation of the Confrontation Clause itself.

Under the Sixth Amendment, a criminal defendant has the right to confront his accusers, which includes the right to effective cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986). Effective cross-examination, in turn, requires that the defendant be able to expose a witness's biases and motives to lie. Id. at 678–79, 106 S. Ct. at 1435. Generally stated, trial courts must allow questioning on an issue if, after hearing the proposed testimony, "[a] reasonable jury might have received a significantly different impression" of the witness's credibility. Id. at 680, 106 S. Ct. at 1436.

At the same time, trial courts retain discretion to limit cross-examination to protect against factors such as "'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'" Olden v. Kentucky, 488 U.S. 227, 232, 109 S. Ct. 480, 483, 102 L. Ed. 2d 513 (1988) (per curiam) (quoting Van Arsdall, 475 U.S. at 679, 106 S. Ct. at 1435).

---

ineffective assistance under Strickland de novo because the state court had expressly declined to reach the prejudice element in its analysis, id. at 390, 125 S. Ct. at 2467. Language in Harington, however, suggests that this portion of Rompilla may no longer be good law. See Harrington, 131 S. Ct. at 784 (stating that AEDPA deference applies "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated."). We need not further opine on this issue, however, because the District Court of Appeal did rule on Childers's Confrontation Clause claim. Rompilla's de novo review, if it remains good law, would not apply here.

30

Let us compare this standard with the District Court of Appeal's analysis. The court found that the Notice of Revocation had little probative value because: (1) the March 13 ruling would undercut the implication that Junior was lying; (2) the Notice of Revocation did not provide much extra information; and (3) Childers was able to thoroughly cross-examine Junior about the conflicting statements underlying the Notice of Revocation. Stated in the language of Confrontation Clause precedent, the court did not view the Notice of Revocation as giving the jury a different impression of Junior's credibility.

Against the Notice of Revocation's minimal probative value, the court found several ills. The Notice of Revocation and the State's comments regarding Junior's veracity would "distract the jury during their deliberations," "improperly influence the jury's evaluation of Junior's veracity," "and prejudice the State's case with unreliable evidence." These concerns are nearly identical to those mentioned in Van Arsdall as legitimate reasons to limit cross-examination. See 475 U.S. at 679, 106 S. Ct. at 1435 (stating that trial courts may limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"). The court's analysis of the Notice of Revocation issue therefore addressed the Confrontation Clauses's concerns.

31

The same holds regarding the court's brief discussion of the Elliot acquittal. Again, the court excluded the Elliot acquittal under the general rule that "verdicts from other cases are generally inadmissible." Childers, 936 So. 2d at 596. This general rule is grounded in the concepts of jury confusion and prejudice; admitting the verdict would confuse the jury and cause it to defer to the prior jury's decision. See Secada, 563 So. 2d at 173 (discussing the potential for jury confusion caused by information regarding prior verdicts). Jury confusion was a concern explicitly articulated in Van Arsdall to justify limits on cross-examination. 475 U.S. at 679, 106 S. Ct. at 1435. The only difference, then, between the court's treatment of the Elliot acquittal and the Notice of Revocation is the court's explicit evaluation of the latter's probative value. Given that the District Court of Appeal's decision would receive deference had it said nothing at all, see Harrington, 131 S. Ct. at 784–85, we cannot say that this minor difference gives a federal court license to conduct de novo review.[19]

III.

---

[19] We further note that several of the concurring and dissenting opinions explicitly mentioned the Confrontation Clause and relevant Supreme Court precedent. E.g., Childers v. State, 936 So. 2d at 599 (Thomas, J., specially concurring); id. at 604–07 (Kahn, C.J., concurring in part and dissenting in part); id. at 617 (Browning, J., concurring in part and dissenting in part) (recognizing the applicability of the Confrontation Clause but not discussing the issue in depth "in the interest of brevity"); id. at 617–19 (Polston, J., concurring in part and dissenting in part); id. at 615 (Benton, J., concurring in part and dissenting in part). Childers's Confrontation Clause claim therefore did not slip the court's collective mind.

32

Presented with an adjudication on the merits of Childers's claim, we may grant Childers's petition for a writ of habeas corpus only if the District Court of Appeal's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Terry Williams v. Taylor, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). Under this prong, the state court need not cite federal law "so long as neither the reasoning nor the result of the state-court decision contradicts" the Supreme Court's precedents. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam). And the difference between the state court's decision and the Supreme Court precedent must be more than slight; the state court decision must be "substantially different." Terry Williams, 529 at 405, 120 S. Ct. at 1519.

An "unreasonable application" of federal law occurs when the "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

33

case." Id. at 413, 120 S. Ct. at 1523. Therefore, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, ___ U.S. ____, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (citation and internal quotation marks omitted). Even if we believe the state court's decision to be incorrect, we cannot issue the writ unless that decision was also unreasonable. Terry Williams, 529 U.S. at 412, 120 S. Ct. at 1523.

"Clearly established federal law" refers to the "holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." Id. Therefore, the state court's decision must be a reasonable application of "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Yarborough v. Alvarado, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147, 158 L. Ed. 2d 938 (2004) (quoting Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 1173, 155 L. Ed. 2d 144 (2003)).

Finally, when evaluating the state court's legal determinations, we must presume the state court's subsidiary factual findings correct. 28 U.S.C. § 2254(e)(1). We may not disturb these fact findings unless the petitioner produces clear and convincing evidence to the contrary. Id. Therefore, where

34

factual findings underlay the state court's legal ruling, our already deferential review becomes doubly so. Cf. Knowles v. Mirzayance, ___ U.S. ____, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009) (stating that federal habeas courts must apply "doubly deferential judicial review" to a state court's evaluation of ineffective assistance of counsel claims under the already deferential standard of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

With AEDPA's standard of review in mind, we first lay out the relevant Supreme Court precedent regarding limits on cross-examination. We then demonstrate how this court would apply this precedent on direct review of federal criminal convictions. This demonstration will hopefully illustrate the deference we show to lower federal courts' limitations of cross-examination; AEDPA's logic requires that we apply even more deference to the District Court of Appeal's decision we review here. Finally, we compare the District Court of Appeal's decision with the Supreme Court's precedent and conclude that the Florida court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

A.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all

35

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The principal protection derived from the confrontation right is the right to effective cross-examination of the State's witnesses. See Crawford v. Washington, 541 U.S. 36, 61, 124 S. Ct. 1354, 1370, 158 L. Ed. 2d 177 (2004); United States v. Owens, 484 U.S. 554, 559, 108 S. Ct. 838, 842, 98 L. Ed. 2d 951 (1988). Through effective cross-examination, the criminal defendant hopes to demonstrate to the jury of her peers why it should not believe this particular witness. Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986). Effective cross-examination is therefore not limited merely to testimonial inconsistencies, but also the witness's "biases, prejudices or ulterior motives." Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974).

The adjective "effective" works both ways, however. "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective whatever way, and to whatever extent, the defense might wish.'" Owens, 484 U.S. at 559, 108 S. Ct. at 842 (emphasis in original) (quoting Kentucky v. Stincer, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664, 96 L. Ed. 2d 631 (1987)). A trial court retains wide discretion to limit cross-examination, provided that it permits the defendant with "an opportunity for effective cross-

36

examination." United States v. Maxwell, 579 F.3d 1282, 1296 (11th Cir. 2009) (emphasis added).

Childers argues that evidence of the Elliot acquittal and the Notice of Revocation would show Junior's motivation to embellish his testimony to implicate Childers more explicitly. To evaluate whether the District Court of Appeal acted unreasonably in barring this evidence, we must first examine the relevant precedent from the United States Supreme Court at the time the Florida court ruled on Childers's claim.

In 2006, three cases guided the States' ability to limit cross-examination into a witness's biases: Davis, Van Arsdall, and Olden v. Kentucky, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) (per curiam). These cases create the anchor against which we evaluate the District Court of Appeal's ruling. This ruling must stand if (1) it was neither contrary to, nor an unreasonable application of, the rule set down by these three cases, or (2) the cases did not establish an applicable rule. We now examine what, precisely, these seminal cases held.

In Davis, the State's crucial witness was a minor who testified that he saw the defendant standing near a car later found to contain the proceeds of a late night bank robbery. 415 U.S. at 310–11, 94 S. Ct. at 1107–08. To impeach the witness, the defendant sought to introduce evidence of the witness's juvenile adjudication

37

for burglary; the witness was still on probation from that charge when he testified at the defendant's trial.  Id.  This information, the defendant argued, would prove that the witness

> acted out of fear or concern of possible jeopardy to his probation.  Not only might [the witness] have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who [committed the crime], but [the witness] might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation.

Id. at 311, 94 S. Ct. at 1108.

The trial court barred the defendant from admitting such evidence or questioning the witness regarding the conviction or his probation status.  Id.  In its place, defense counsel asked the witness whether he was "worried about any suspicions the police might have been expected to harbor against him."  Id. at 312, 94 S. Ct. at 1108.  The witness was thus free to aver any suspicion or fear because defense counsel was prohibited from cross-examining the witness about the prior conviction.  Id. at 314, 94 S. Ct. at 1109.

The United States Supreme Court found that this limitation violated the defendant's confrontation rights.  Exposing a witness's bias and incentive to lie, the Court maintained, was an important function of cross-examination.  Id. at 316, 94 S. Ct. at 1110.  The trial court's actions deprived the defendant of providing the jury with any evidence of such bias: "While counsel was permitted to ask [the

38

witness] whether he was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." Id. at 318, 94 S. Ct. at 1111. Limiting cross-examination in this manner went beyond the "broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." Id. at 316, 94 S. Ct. at 1110.

Van Arsdall involved another circumstance in which the trial court barred all questioning of possible bias. At trial, the State based its case on circumstantial evidence. 475 U.S. at 674, 106 S. Ct. at 1433. One witness testified that he saw the defendant in the room where the killing occurred roughly thirty minutes before the time of the murder. Id. at 675, 106 S. Ct. at 1433. The defendant sought to impeach the witness by questioning him about the dismissal of criminal charges for public drunkenness; the charges had been dropped in exchange for the witness's promise to speak with prosecutors about the defendant's case. Id. at 676, 106 S. Ct. at 1433–34. The trial court barred any cross-examination about the agreement, citing Delaware Rule of Evidence 403.[20]

---

[20] Delaware's Rule 403 is virtually identical to Fed. R. Evid. 403 and reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Del. R. Evid. 403.

Fed. R. Evid. 403 reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation

Limiting cross-examination in this manner violated the defendant's rights under the Confrontation Clause. According to the United State Supreme Court, the trial court could not "prohibit[] all inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge." Id. at 679, 106 S. Ct. at 1435 (emphasis in original). The Court noted, however, that its decision did not require trial courts to abdicate their traditional powers. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. This wide latitude, however, just did not encompass the power to limit all inquiry into potential bias.

In Olden, the Court again ruled that a trial court's traditional powers did not empower it to completely bar cross-examination into a witness's bias. The defendant in Olden was a black man accused of raping a white woman. 488 U.S. at 228, 109 S. Ct. at 481. Following the alleged rape, the defendant drove the victim to her residence, which she shared with her boyfriend, who was black. Id. Both the victim and her boyfriend were married to other people at the time of the alleged

of cumulative evidence."

40

rape.  Id. at 229–30, 109 S. Ct. at 482.  She told her boyfriend that the defendant had raped her.  Id. at 229, 109 S. Ct. at 481.  Throughout the investigation, the victim changed her story several times, and the defense was able to impeach her using these prior inconsistent statements.  Id. at 228, 109 S. Ct. at 481.

However, the trial court barred the defense from questioning the victim about her co-habitation with the boyfriend.  Id. at 230, 109 S. Ct. at 482.  The defendant sought to use this information to expose a potential motive for her testimony; the defense theorized that she fabricated the story to save the relationship.  Id.  The Kentucky Court of Appeals affirmed the trial court.  It reasoned that the extramarital and interracial nature of the victim's relationship "may have created extreme prejudice against" the victim.  Id. at 231, 109 S. Ct. at 482.

The Supreme Court reversed the defendant's conviction and found that testimony regarding the relationship would have provided the jury with a "significantly different impression of [the witness's] credibility."  Id. at 232, 109 S. Ct. at 483.  Again, the Court noted that trial courts may reasonably limit cross-examination to protect against factors such as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant."  Id. (citing Van Arsdall, 475 U.S. at 679,

41

106 S. Ct. at 1435). The limitation imposed by the trial court in <u>Olden</u>, however, was "beyond all reason" because it was based on "speculation as to the effect of jurors' racial biases." <u>Id.</u>

From these three cases, two "rules" emerge. First, trial courts may not prohibit all questioning into witnesses' biases. In each of the precedential cases, the trial court barred the defense from informing the jury of the witness's potential bias and how that might affect the witness's testimony. The Court, therefore, never had occasion to require trial courts to permit cross-examination on more than the existence of a bias.

The Court's seemingly broad language in articulating the confrontation right should not widen this narrow rule on habeas review. In two of these cases, the Court stated that trial courts must permit all cross-examination that might provide the jury with "a significantly different impression" of a witness's credibility. <u>Olden</u>, 488 U.S. at 232, 109 S. Ct. at 483; <u>Van Arsdall</u>, 475 U.S. at 680, 106 S. Ct. at 1436. Extrapolated, this statement could be read to require far more extensive questioning than simply regarding the existence of a bias. AEDPA prevents us from doing so; federal habeas courts judge state courts against the Supreme Court's holdings, not its dicta. <u>Terry Williams</u>, 529 U.S. at 413, 120 S. Ct. at 1523. Broad language—<u>i.e.</u>, dicta—does not permit us to expansively apply the

42

Court's holdings far beyond the facts of those cases. See Callahan v. Campbell, 427 F.3d 897, 930 (11th Cir. 2005) (focusing on the specific facts of Supreme Court precedent, rather than the Court's general language, to determine clearly established Supreme Court precedent). Therefore, for the purposes of defining "clearly established federal law" under AEDPA, a state court satisfies the "significantly different impression" test when it permits some questioning about a witness's biases.

That standard does not, however, tell the state courts how deeply they must permit the defendant to delve into those biases. This uncertainty leads to the second "rule": trial courts have wide discretion to limit cross-examination when they have allowed the defendant to expose some evidence of bias. Courts may limit cross-examination for the same factors used in Federal—and Florida—Rule 403: harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.

B.

This deferential standard applies beyond the AEDPA context—we apply a similar inquiry when reviewing federal criminal convictions on direct review. As shown below, our direct review affords great deference to a district court's decision to limit cross-examination. The import of this discussion suggests the

43

breadth of the deference we must afford state court decisions to limit cross-examination.  If we review a district court ruling only for an abuse of discretion, our role on habeas review regarding similar subject matter is necessarily narrower.

As a limitation on cross-examination, we would review the district court's ruling only for an abuse of discretion.  United States v. Maxwell, 579 F.3d 1282, 1295 (11th Cir. 2009) ("We review [the] claim that the district court improperly limited the scope of . . . cross-examination for clear abuse of discretion." (citations omitted)); United States v. Van Dorn, 925 F.2d 1331, 1335 (11th Cir. 1991) ("In reviewing the curtailment of cross-examination or the admissibility of extrinsic evidence to attack the credibility of a witness, a reviewing court must determine whether the district judge acted within the large measure of discretion accorded a trial judge by Fed. R. Evid. 403 and 608(b)." (citations and internal quotation marks omitted)).  This discretion would be informed, however, by the defendant's confrontation rights.  See United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994) (stating that the defense must receive a "full and fair opportunity to probe and expose [the] infirmities [in a witness' testimony] through cross-examination" notwithstanding the trial court's "wide latitude" to impose reasonable limits on cross-examination (citations omitted)); United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992) ("Therefore, while the discretion

of the district court in ruling on the admissibility of evidence is entitled to a great deal of deference by this court, this discretion is somewhat narrower where the district court limits a defendant's right to cross-examine witnesses against him." (citations omitted)).

For example, in Lankford, we found that the district court abused its discretion when it barred all cross-examination regarding the witness's son's arrest for possession of marijuana and how that may have influenced the witness's cooperation with the government. 955 F.2d at 1549; see also United States v. Funches, 135 F.3d 1405, 1408 (11th Cir. 1998) (characterizing Lankford's review as abuse of discretion review). Because the district court prohibited all cross-examination about a relevant source of bias, it necessarily abused its discretion. Lankford, 955 F.2d at 1549 ("The probative value of such strong evidence of possible motive outweighs any possible prejudice to [the witness].").

Provided that the district court satisfied this minimal threshold—and its decision was not presumptively an abuse of discretion—our normal abuse of discretion review would apply. See, e.g., United States v. Williams, 526 F.3d 1312, 1319–20 (11th Cir. 2008). That review, like our review under AEDPA, is highly deferential. Maxwell, 579 F.3d at 1296 ("When measured against these broad standards [for the Confrontation Clause], we are satisfied that the district

45

court acted within its considerable discretion."). And, like our review under AEDPA, we may only reverse the district court's decision if it fell outside of the "broad range of permissible conclusions." Cf. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400–01, 110 S. Ct. 2447, 2458 (1990) (describing the "clearly erroneous" standard of review over district court findings of fact, which the Court described as "indistinguishable" from the abuse of discretion standard).

Our deference to district courts' fact-imbued decisions stems from a simple division of labor and institutional competence. District courts are closer to the facts and therefore in a superior position both to "marshal the pertinent facts and apply fact-dependent legal standard[s]." Id. at 402, 110 S. Ct. at 2459 (explaining why appellate courts should defer to district court rulings on Federal Rule of Civil Procedure 11). This logic applies with equal force to a state court's decision on habeas review.

Applied to our review on habeas, comity and federalism add an extra gloss to this already deferential review. See Panetti v. Quarterman, 551 U.S. 930, 945, 127 S. Ct. 2842, 2854, 168 L. Ed. 2d 662 (2007) ("[AEDPA's] design is to further the principles of comity, finality and federalism." (internal quotations and citations omitted)). Indeed, these principles "inform," "shape," and "limit the scope of federal intrusion into state criminal adjudications." Michael Williams v. Taylor,

46

529 U.S. 420, 436, 120 S. Ct. 1479, 1490 (2000). These layered

interests—federalism atop institutional competence—suggest that state court

decisions on limits to cross-examination should receive "doubly deferential"

review. Cf. Knowles, 129 S. Ct. at 1420.

C.

1.

With these rules in mind, we must determine whether the District Court of

Appeal's decision was contrary to, or an unreasonable application of, the Supreme

Court's precedents. To do this, we must first examine what the trial court

permitted at Childers's trial, and what the District Court of Appeal found sufficient

under the Confrontation Clause.

Childers's attorneys cross-examined Junior extensively for ten hours, during

which time the jury learned of each inconsistent statement that eventually

blossomed into the embellished form he presented on direct examination. Junior

also answered questions about his plea agreement with the State. The jury knew

that he had pleaded nolo contendere in exchange for his testimony and that,

because of his testimony, he avoided a possible sentence of 125 years. The trial

court did not allow—and the District Court of Appeal did not require—questioning

regarding the inner workings of Junior's plea agreement, i.e., the Elliot acquittal,

47

the Notice of Revocation, and how both would affect his plea agreement and corresponding trial testimony.

This limitation is neither contrary to, nor an unreasonable application of, Supreme Court precedent. As explained in part III.A, <u>supra</u>, clearly established law says only that trial courts cannot bar <u>all</u> cross-examination into a witness's possible biases. For example, in <u>Van Arsdall</u>, the state court erred because it did not allow the defendant to ask the State's witness about his arrangement with the prosecution. 475 U.S. at 676, 106 S. Ct. at 1433–34. Childers's attorneys were clearly able to probe Junior's biases regarding the plea agreement. Unlike the juries in <u>Davis</u>, <u>Van Arsdall</u>, and <u>Olden</u>, Childers's jury learned about Junior's motive to lie. The District Court of Appeal's decision therefore did not unreasonably apply federal law. And, because the court did not confront "facts that are materially indistinguishable from" Supreme Court precedents, <u>Terry Williams</u>, 529 U.S. at 406, 120 S. Ct. at 1520, its decision was not contrary to clearly established federal law.

However, Childers appears to argue that the Notice of Revocation and the Elliot acquittal create biases separate from the plea agreement and that the trial court was required to permit questioning on these topics. Our cases suggest that permitting cross-examination regarding one source of bias does not permit trial

courts to bar cross-examination regarding a separate source of bias.  E.g.,

Lankford, 955 F.2d at 1549 (holding that the defendant should have been permitted

to cross-examine the prosecution's witness about the witness's incentive to lie

regarding his son's arrest for drug possession, which was an independent source of

bias from the witness's own plea agreement with the prosecution).

The relevant issue, then, is how broadly or narrowly we should define each

"source" of bias.  A narrower definition of "sources" would create more topics

about which trial courts must permit cross-examination, and would

correspondingly constrict a trial court's discretion to limit cross-examination.  A

broader concept of "sources" would have the opposite effect, creating fewer

required topics of cross-examination and increasing the trial court's discretion.

To decide this issue on habeas review, we must look to the relevant Supreme

Court precedent.  On this topic, the Court's precedent is silent.  None of the trial

courts in those cases permitted any cross-examination regarding the witness's bias.

The Court therefore had no occasion to define the breadth of a source of bias.

This silence left the District Court of Appeal free to construct a reasonable

application of the Supreme Court's instruction that trial courts may not "prohibit[]

all inquiry" into a witness's relevant bias.  Van Arsdall, 475 U.S. at 679, 106 S. Ct.

at 1436.  The District Court of Appeal implicitly found the Notice of Revocation

49

and the Elliot acquittal inextricably linked to Junior's plea agreement; all three pieces—the Notice of Revocation, the Elliot acquittal, and the plea agreement—stemmed from the same transaction between Junior and the State. The court found that the Notice of Revocation had little probative value because Childers's counsel extensively cross-examined Junior regarding the terms of Junior's plea agreement. Childers v. State, 936 So. 2d 585, 594 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam). This ruling effectively meant that the Notice of Revocation and Junior's plea agreement expressed the same bias, and hence were not independent sources of bias. And, although the court said little regarding the Elliot acquittal, the analysis regarding the Notice of Revocation would apply with equal force to that subject.

We agree with the District Court of Appeal's—albeit implicit—reasoning. As a factual matter, both the Notice of Revocation and the Elliot acquittal were intimately entwined with the overarching plea agreement; neither could be understood absent the agreement. Questioning about the plea agreement exposed the jury to Junior's relevant bias—his relationship with the State as the State's witness. The Notice of Revocation and the Elliot acquittal were merely individual manifestations of that same bias.[21] We therefore conclude that the District Court of

---

[21] The dissent constructs a straw man to suggest that our conclusion goes too far:

50

Appeal did not unreasonably apply the Supreme Court's instruction in Van Arsdall

that trial courts may not "prohibit[] all inquiry" into a witness's relevant bias.

2.

Having permitted sufficient cross-examination regarding Junior's biases, the

trial court and the District Court of Appeal were free to exercise their discretion to

limit cross-examination. As the relevant Supreme Court precedent held: "[T]rial

judges retain wide latitude insofar as the Confrontation Clause is concerned to

impose reasonable limits on such cross-examination based on concerns about,

among other things, harassment, prejudice, confusion of the issues, the witness'

safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall,

475 U.S. at 679, 106 S. Ct. at 1435.

When evaluating the Florida court's actions at this juncture, we must keep in

mind the multiple layers of deference owed to the state court's determination.

First, even on direct review, we would apply the deferential abuse of discretion

---

Under the majority's phrasing, if it can be shown that a witness is cooperating
with the government under a plea agreement, the trial court can exclude evidence
of a romantic relationship or financial arrangement between the witness and a
state actor because the "bias," i.e. the witness's "relationship with the state," has
already been exposed.

If Junior had begun a romantic relationship with one of the prosecutors, that would clearly be a
separate source of bias appropriate for cross-examination. The transaction between Junior and
the State was Junior's agreement to testify in exchange for a lenient sentence. We doubt that
Junior's plea agreement ever contemplated the provision of assistance in the areas suggested by
the dissent.

51

standard to limitations on cross-examination.  See part III.B, supra.  Second,

AEDPA requires us to defer to the state court's decision unless it was

unreasonable.  28 U.S.C. § 2254(d)(1).  And third, the state court's factual findings

must be presumed correct.  Id. § 2254(e)(1).  These layers point to the exceptional

deference owed to the state court here.  Cf. Knowles, 129 S. Ct. at 1420.  Our

analysis addresses the Notice of Revocation and the Elliot acquittal in turn.

The District Court of Appeal found that the Notice of Revocation was

excludable under Florida Evidence Rule 403 because the prejudice outweighed the

probative value.[22]  To understand this conclusion, remember that Childers sought

to use the Notice of Revocation not only to probe Junior's state of mind, see part

I.B, supra, but also to inform the jury that the State believed its own witness was a

liar, see part I.C, supra.[23]

It was this second aspect upon which the District Court of Appeal focused.

Using the Notice of Revocation in this way would, the court found, present the jury

---

[22]  As stated in part I.C, supra, Florida Evidence Rule 403 provides in pertinent part:
"**Exclusion on grounds of prejudice or confusion.—**Relevant evidence is inadmissible if its
probative value is substantially outweighed by the danger of unfair prejudice, confusion of
issues, misleading the jury, or needless presentation of cumulative evidence."  Fla. Stat.
§ 90.403.

[23]  As stated above, note 4, supra, State Attorney Curtis Golden and Assistant State
Attorneys John Simon and Tiffany Sims represented the State at the March 13 hearing regarding
the Notice of Revocation.  Golden and Simon also signed the written Notice of Revocation on
the State's behalf.  Childers would have used statements in the Notice of Revocation and at the
March 13 hearing by these three attorneys—who also represented the State in Childers's
prosecution—to show that the State believed Junior was lying.

52

with otherwise inadmissible opinion testimony regarding Junior's credibility. Childers, 936 So. 2d at 595.  This evidence would therefore "distract the jury during their deliberations; improperly influence the jury's evaluation of Junior's veracity, where the credibility of his testimony was a central issue; and prejudice the State's case with unreliable evidence." Id. at 596.

Although the court did not explain how this evidence would distract the jury, we can easily envision this possibility.  Assume that Childers was permitted to use the Notice of Revocation to tell the jury that the State thought Junior was lying. This argument, in effect, would suggest that the State had suborned perjury.

The State would not sit idly by as this occurred.  Junior was its star witness. Therefore, the State would have to find some way to explain its actions to the jury. The only feasible way to do so would be to put one of Childers's prosecutors on the witness stand.[24]  There, he or she would explain that the State believed that Junior was testifying truthfully now, at Childers's trial; that the January 2003 additions were truthful statements that Junior withheld from his prior statements; and that it was because Junior withheld this information that the State filed the Notice of Revocation.

And, to provide context to the Notice of Revocation, the March 13

---

[24]  As explained in note 4, supra, the same individuals represented the State in the Notice of Revocation matter and at Childers's trial.

53

ruling—in which the trial court effectively found that Junior had told the truth—would likely also have to come into evidence.[25]  Without that piece, how could the jury know if Junior's plea agreement was still in effect?  Again, this ruling would present the jury with yet another opinion regarding Junior's credibility, about which it is supposedly the final arbiter.

This hypothetical testimony would turn Childers's trial into a three-ring circus, with Childers, the State, and the trial judge each telling the jury what it thought of Junior's credibility.  Faced with this possibility, the District Court of Appeal found that this testimony would confuse the jury.  Childers, 936 So. 2d at 596.  This statement is a finding of fact that we must presume correct unless rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  With this finding in place, we cannot break through our three layers of deference and find this decision unreasonable.  And, because this factual scenario is not "materially indistinguishable" from the applicable precedents, the District Court of Appeal's decision was not contrary to federal law.

Similar issues surround the Elliot acquittal.  The District Court of Appeal rejected this piece of evidence by citing the common rule that "[v]erdicts from

---

[25]  The trial court and the District Court of Appeal both found that, if the Notice of Revocation were admissible, the prosecution would be permitted to read the text of the March 13 ruling.

other cases are generally inadmissible." Childers, 936 So. 2d at 596. This maxim does not exist in a vacuum; the concept is rooted in concerns about jury confusion. The court cited Secada v. Weinstein, 563 So. 2d 172 (Fla. 3d Dist. Ct. App. 1990), for this proposition. Secada explained why courts bar evidence of prior verdicts: "[A]ny information as to prior verdicts has the inevitable tendency of causing the jury in the present case to defer to decisions made in a previous one and thus to delegate the uniquely non-delegable duty of reaching its own independent conclusions." Id. at 173. We cannot see—through three layers of deference—how this decision was either contrary to federal law or an unreasonable exercise of the District Court of Appeal's discretion. See Van Arsdall, 475 U.S. at 679, 106 S. Ct. at 1435 (explaining that trial courts have wide discretion to limit cross-examination because of concerns about, among other things, jury confusion).

## IV.

For the foregoing reasons, the district court's denial of Childers's petition for a writ of habeas corpus is

AFFIRMED.

WILSON, Circuit Judge, concurring in the judgment:

I concur in the majority's result because I do not believe the trial court's limited restriction on cross-examination constituted a violation of Childers's Sixth Amendment rights. However, I write separately to object to the majority's overbroad and unnecessary formulation of what constitutes an "adjudication on the merits" under AEDPA—one that adds nothing to existing precedent and risks leaving a segment of properly presented federal constitutional claims without any true merits adjudication at all.

\* \* \*

The majority declares that this case calls upon us to decide what constitutes an adjudication on the merits of a federal constitutional claim. Given that task, we should define our terms.

A "claim" arises from the relationship between a set of facts and a legal right.[1] When asserted by a claimant in a court of law as a basis for legal or

---

[1] Black's Law Dictionary, 264 (8th ed. 2004) (examples of common usage omitted), defines a "claim" as:

    1.    The aggregate of operative facts giving rise to a right enforceable by a court . . . .

    2.    The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional . . . .

    3.    A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for.

equitable relief, it falls to the court to "adjudicate"—meaning, rule upon[2]—that claim. An adjudication "on the merits" of a claim is a ruling based on the court's evaluation of whether those facts pled or proven (depending on the case's posture) entitle a claimant to relief under the prevailing legal rule or standard defining the scope of the relevant right's protection.[3] If a court fails to conduct this evaluation, there can be no adjudication on the merits.

Unfortunately, it is sometimes difficult to ascertain whether a court has undertaken the evaluation necessary to adjudicate the merits of a particular claim. In the habeas context, for example, many state courts—faced with unmanageably large caseloads—routinely deny straightforward post-conviction claims without written opinions, so that they might focus more of their finite resources on the cases presenting the most difficult questions. In Wright v. Secretary for Department of Corrections, we decided that these so-called "summary" dismissals constitute adjudications on the merits, warranting deferential federal review under AEDPA. 278 F.3d 1245, 1254 (11th Cir. 2002). Earlier this year, the Supreme Court ratified our approach, declaring:

> When a federal claim has been presented to a state court

---

[2] See Black's Law Dictionary 45 (8th ed. 2004).

[3] For federal constitutional claims, the "relevant right" is, of course, the right created or preserved by the United States Constitution.

and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.

Harrington v. Richter, — U.S. — , 131 S. Ct. 770, 784–85 (2011).

As the Supreme Court plainly stated, once a claim for relief has been presented to, and denied by, a state court, we are to presume that a state court adjudicated the merits of that claim in the absence of either of two things: "any indication or state-law procedural principles to the contrary." Id. (emphasis added). Today, the majority reads out the disjunctive and extends Richter's presumption to all claims presented to the state court, excepting only those denied purely on procedural grounds and eliminating any provision for non-procedural "indications" that a state court failed to actually adjudicate the merits of a claim. In the words of the majority, "[A]n 'adjudication on the merits' is best defined as any state court decision that does not rest solely on a state procedural bar." Majority Op. at 27 (emphasis added).[4] Or, as rephrased later in that paragraph, "[U]nless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication

---

[4] The majority's declaration that it has "no occasion to expand upon" the language from Richter quoted above, see Majority Op. at 29 n.18, simply cannot be squared with its black-and-white definition of what constitutes an adjudication on the merits. That plain language will be applied by district courts in our Circuit, and it makes no allowance for any non-procedural "indications." The majority's attempt to sidestep this fact is troubling and not the least bit reassuring.

58

on the merits when the petitioner's claim 'is the same claim rejected' by the state court." Id. at 28 (quoting Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362 (2002) (per curiam)).[5]

Though this sweeping rule is both clear and easily administrable, it ignores the basic elements that comprise an actual adjudication on the merits (discussed above) and unnecessarily conflicts with a segment of our Circuit's doctrine, as well as Supreme Court case law, that strives to strike an honest balance between respecting the prerogatives of the state courts while ensuring that every habeas petitioner has an actual and meaningful opportunity to seek redress for constitutional violations.[6] See Rompilla v. Beard, 545 U.S. 374, 390, 125 S. Ct.

---

[5] It should be noted that this rule is tautological. Whether a state court has, in fact, rejected the "same claim" presented in the federal petition is exactly the question that we seek to answer. Incorporating the question into our answer merely begs the question.

As described below, the majority's phrasing of its extended presumption illustrates how it has erroneously relied on Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002) (per curiam). The cited discussion in that case was premised on an explicit understanding that the claim presented in the federal petition was, in fact, the "same claim" rejected in state court. Therefore, so long as its result was neither contrary to nor an unreasonable application of federal law, the state court's ignorance of federal law was irrelevant.

Our task, as the majority has defined it, is to determine when we can share the same threshold understanding held by the Supreme Court in Early: that a claim presented in the federal petition was, in fact, the "same claim" rejected in state court. The majority appears to read Early to say, in essence, that whenever a federal habeas claim has been presented in a prior state court proceeding and not disposed of solely on procedural grounds, it has necessarily been adjudicated on the merits. For the reasons discussed below, I believe this interpretation reads far too much into Early and ignores critical distinctions between that case and this one.

[6] One of the most unfortunate aspects of today's opinion is that the presumption crafted by the majority is wholly unnecessary. The majority clearly expresses that it believes that the state court did not misunderstand Childers's claim and did, in fact, address its substance. See Majority Op. at 30 n.18. If that is true, then the majority's entire discussion regarding what

59

2456 (2005); Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527 (2003);

Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009); Espy v. Massac, 443

F.3d 1362, 1364–65 (11th Cir. 2006); Davis v. Sec'y for Dept. of Corrs., 341 F.3d

1310, 1313 (11th Cir. 2003) (per curiam); Romine v. Head, 253 F.3d 1349, 1365

(11th Cir. 2001).

The majority offers virtually no explanation for its alteration of Richter.

However, based on its citations to authority, the majority's definition of what

constitutes an adjudication on the merits appears to rely heavily on the Supreme

Court's opinion in Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002) (per curiam).

See Majority Op. at 26–28. I believe that reliance is misplaced.

In Early, the petitioner, Packer, claimed a due process violation based on

allegedly coercive remarks made by the trial judge during a prolonged and lopsided

jury deliberation. 537 U.S. at 6. Announcing that the state court need not cite or

even be aware of federal case law in order for its decision to garner deference

under AEDPA, the Early Court reversed the Ninth Circuit's decision to grant

habeas relief because the state court's decision was not contrary to clearly

established federal law. Id. at 8. The Supreme Court's discussion in that case is of

limited value for our purposes today.

constitutes an adjudication on the merits is unnecessary to resolve this case. Hence, it is mere dicta, and the majority has created an unnecessarily doctrinal conflict.

60

The Early Court's invocation of § 2254(d) was explicitly premised on a threshold finding that the claim on which petitioner sought federal relief was the very "same claim" on which the petitioner was denied relief in state court.[7] The Court, however, said nothing about how or when such a threshold finding is appropriate. It is true that the Supreme Court necessarily determined that a state court unaware of federal law could nonetheless adjudicate the merits of a federal constitutional claim. But the fact that a state court can adjudicate the merits of a federal claim despite its unawareness of the applicable federal law, does not mean that any particular court did.

I believe a close reading of Early reveals two critical distinctions between this case and that, which demonstrate exactly why the Supreme Court's conclusion was justified and why the majority's is not. In short, when the state court in Early made its merits evaluation of Packer's jury-coercion claim, it was evaluating the exact same claim that Packer later pursued in federal court. And when the state court concluded that Packer was not entitled to relief under the legal rules and standards it applied, it did so using legal rules and standards that actually and dispositively resolved Packer's federal constitutional question. In Childers's case,

_____

[7] "The jury-coercion claim in respondent's habeas petition is the same claim rejected on the merits in his direct appeal to the state appellate court, and the Ninth Circuit correctly recognized that § 2254(d) was therefore applicable." Early, 537 U.S. at 8.

61

neither of these things was true.

First, even though it did so without deploying federal law, the state court in Early evaluated the merits of Packer's actual claim. Meaning, it evaluated whether the judge's comments (i.e., the operative facts) infringed upon Packer's entitlement to be tried by a jury free from coercive influence (i.e., the operative right). In this case, the majority fails to acknowledge that the Florida District Court of Appeal ("Florida DCA") addressed a wholly different claim than the one Childers presented.

Childers raised a claim for relief under the Sixth Amendment's unique procedural guarantee of confrontation. He argued that he was entitled to utilize the excluded pieces of evidence at trial, not for their intrinsic evidentiary value, but rather to lay bare an otherwise unknowable motivation for Junior's embellishment of his prior testimony. Notwithstanding his properly presented Confrontation Clause claim, the Florida DCA evaluated Childers's entitlement to relief under Florida's substantive evidentiary rules.[8] When it did so—reviewing the trial

---

[8] The Florida DCA was unequivocal regarding the legal basis for its ruling. For example:

> Concerning the issues raised on appeal, we conclude that, although the trial court erred in its conclusion that the State's attempt to revoke Willie Junior's plea agreement was irrelevant, the evidence was properly excluded under section 90.403, Florida Statutes (2002), because the limited probative value of this evidence was substantially outweighed by the danger of unfair prejudice. We therefore affirm the trial court's ruling under the so-called "tipsy coachman" rule.

62

court's balancing of the evidence's probativeness and prejudice for an abuse of discretion—it failed to actually adjudicate the merits of Childers's related, but independent, federal constitutional claim. Therefore, when Childers subsequently presented that claim for our review, unlike in Early, there was no prior state court ruling on the "same claim" to bind us.

Second, even if we ignore this dispositive distinction with Early and pretend that the state court did not misconstrue Childers's claim, there is a second compelling reason why Early does not support the majority's presumption. The Florida DCA did not evaluate Childers's federal constitutional claim in light of a legal rule or standard sufficient to adjudicate its merit.

The Early Court plainly determined that the California state court evaluated the merits of Packer's federal constitutional claim using state law. But the California state law of jury coercion deployed by the state court subsumed the relevant federal standard.[9] Therefore, when the state court evaluated whether the trial judge's comments were violative of Packer's right to have a jury free from

Childers v. State, 936 So. 2d 585, 587 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam).
    If such language is not an "indication" that the state court failed to adjudicate Childers's Confrontation Clause claim, I do not know what is.

    [9] The California state law at issue protected the same right as the federal law, but offered more robust protection. See Early, 537 U.S. at 8 ("The Ninth Circuit's disapproval of the Court of Appeal's failure to cite this Court's cases is especially puzzling since the state court cited instead decisions from the California Supreme Court that impose even greater restrictions for the avoidance of potentially coercive jury instructions.").

63

coercion under state law, it necessarily and completely answered the parallel federal question.

Here, though certain aspects of the respective analyses overlap, a proper exclusion of Childers's proffered evidence under Florida Rule 403 would not similarly rule out a violation of the Sixth Amendment's procedural guarantee of effective cross-examination. In the interests of economy, I defer to my dissenting colleague's explanation on this point; but we need look no further than Delaware v. Van Arsdale itself to understand that there is a meaningful distinction between these legal claims. 475 U.S. 673, 676–80, 106 S. Ct. 1431 (1986) (finding a trial court's limitation of cross-examination violative of the Confrontation Clause, despite the limitation in question having been made pursuant to Delaware Rule of Evidence 403).[10]

In sum, the state court in Early adjudicated Packer's actual claim in light of a legal standard that actually protected the full sweep of the federal constitutional right. To put it another way, whether looking through the lens of state law or federal law, the state court asked the same question; and with respect to the scope of protection provided by the Federal Constitution, whether evaluating that

---

[10] Delaware Rule of Evidence 403 is "virtually identical" to Federal Rule of Evidence 403, see Delaware v. Van Arsdale, 475 U.S. 673, 676 n.2, 106 S. Ct. 1431 (1986), and tracks Florida Rule 403.

64

question in light of state law or federal law, the state court <u>necessarily</u> reached the same answer. Conversely, here, the Florida DCA adjudicated a different claim, and it did so using state law that did not necessarily resolve the federal question.

The majority's apparent interpretation of <u>Early</u> holds for all cases sharing <u>Early</u>'s essential attributes: Where a state court previously evaluated the same claim later pursued in federal court and did so using a legal standard that—regardless of whether federal in name—necessarily protects the same space or conduct as federal law, we should consider that evaluation an adjudication on the merits of that federal claim under AEDPA. However, when a state court either fails to evaluate the proper claim or evaluates the proper claim using a non-federal standard that is neither co-terminus with federal law nor more protective, common sense mandates that we cannot consider such a decision to be an adjudication on the merits of a federal constitutional claim. Childers's case falls into this latter category.[11]

_____

[11] The close relationship between a 403-type evidentiary analysis and a <u>Van Arsdale</u>-type Confrontation Clause analysis may obscure the perverse consequences of the majority's approach. Those consequences, however, are easily illustrated if we consider a related and more familiar area of tension between substantive evidentiary law and the Constitution's procedural guarantee of confrontation: the admission of testimonial hearsay at trial.

Like their federal counterparts, most state court judges forged their understanding of the Sixth Amendment at a time when a valid state evidentiary ruling that proffered out-of-court statements fell within a "firmly rooted" exception to the hearsay bar precluded a Confrontation Clause violation. <u>See, e.g.</u>, <u>Ohio v. Roberts</u>, 448 U.S. 56, 66, 100 S. Ct. 2531 (1980). In 2004, however, the Supreme Court drastically reformed federal constitutional law to disentangle the

65

* * *

The current body of Supreme Court case law—without our unnecessary gloss—fits together naturally and functionally. When a state court issues an order without articulating its reasons, Richter instructs us (as has our own precedent for nearly a decade) to do what judges often do when faced with a silent record: presume that a court—or a lawyer[12]—or a jury[13]—properly performed its duties in accordance with the law, absent any indication to the contrary. See 131 S. Ct. at 784–85. And when a state court invests the time and effort to issue a written explanation of its decision, it will be a rare case indeed where a non-procedural

---

explicit procedural guarantee of the Confrontation Clause from a court's substantive evaluation of an out-of-court statement's reliability. See Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). Under the majority's rule as applied in this case, if a habeas petitioner challenged the admission of a testimonial, out-of-court statement at trial, and the state court—failing to take cognizance of Crawford—simply ruled on the propriety of admitting the hearsay testimony based on its permissibility under a firmly rooted hearsay exception, we would be precluded from giving that petitioner her first plenary ruling on her related, but distinct, constitutional claim. This means that even if the petitioner's Confrontation Clause rights were violated and the state court (presumably) would have granted relief had it actually adjudicated the merits of the Sixth Amendment claim, our hands would be tied unless the constitutional error was so clear as to meet the exceedingly high bar set by § 2254(d). This would be wholly inappropriate if the claimant had never before had a genuine and meaningful review of her actual claim. And "AEDPA does not require such a crabbed and illogical" interpretation. See Wellons v. Hall, — U.S. — , 130 S. Ct. 727, 730 n.3 (2010) (per curiam).

[12] See Chandler v. United States, 218 F.3d 1305, 1315 n.15 (11th Cir. 2000) (en banc) ("[W]here the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." (second alteration in original) (citation omitted)).

[13] See United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) (per curiam) ("A jury is presumed to follow the instructions given to it by the district judge.").

66

explanation will fail to constitute an adjudication on the merits. However, when a state court chooses to speak and, in so doing, indicates that it did not reach the merits of properly presented federal constitutional claim, it is our unshirkable duty to give that claim its first and proper adjudication.

This straightforward approach—one that seems almost too plain to need defending—not only ensures that every habeas petitioner has at least one unfettered evaluation of her claim by a competent tribunal, but also allows <u>Richter</u> to co-exist comfortably with <u>Wiggins v. Smith</u>[14] and <u>Rompilla v. Beard</u>.[15] The majority expresses skepticism that <u>Wiggins</u> and <u>Rompilla</u> remain good law in the wake of <u>Richter</u>. <u>See</u> Majority Op. at 30 n.18. I strongly disagree.

The <u>Richter</u> Court cited both <u>Wiggins</u> and <u>Rompilla</u> without the slightest hint of disapproval. <u>See</u> 131 S. Ct. at 789. Furthermore, I agree with our esteemed Seventh Circuit colleague that, "[w]e certainly cannot assume that the Court [in <u>Richter</u>] overruled <u>sub</u> <u>silentio</u> its holding in <u>Wiggins</u>—a precedent so important to the daily work of the lower federal courts." <u>Sussman v. Jenkins</u>, — F.3d —, 2011 WL 1591810 (April 28, 2011) (Ripple, J.) (denying motion to stay mandate). Finally, there is nothing inconsistent between the language of <u>Richter</u> cited by the

---

[14] 539 U.S. 510, 123 S. Ct. 2527 (2003).

[15] 545 U.S. 374, 125 S. Ct. 2456 (2005).

67

majority, see Majority Op. at 30 n.18,[16] and the relevant holdings from Wiggins

and Rompilla.

Richter dealt with a state-court decision unaccompanied by any explanation

of its rationale. 131 S. Ct. at 780, 784. Citing the important role of summary

dispositions in conserving strained state judicial resources, the Court declined to

displace a generally accepted presumption that a state court had properly disposed

of a claim on the basis of "pure speculation." Id. at 784–85. Conversely, Wiggins

and Rompilla were cases where the Court was not left to speculate as to what the

state court had, and had not, adjudicated. In both, the state courts had expressly

communicated the bases of their decisions in written opinions. Therefore, I believe

Wiggins and Rompilla are best read to stand for the simple, obvious, and (what

should be an) entirely uncontroversial proposition that when we can discern from a

written opinion that a state court did not actually reach the merits of a particular

federal question, AEDPA does not command deference to a prior state-court

---

[16] In full, the relevant language reads:

> Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.

131 S. Ct. at 770, 784. The majority omits the first sentence, which reveals the Richter Court was specifically addressing state court decisions "unaccompanied by an explanation."

68

decision on those merits that does not exist.  See Wiggins, 539 U.S. at 534;

Rompilla, 545 U.S. at 390.

This commonsense reading is supported by the Supreme Court's recent

reliance on those cases for that very same general proposition in other contexts.

See, e.g., Cone v. Bell, — U.S. —, 129 S. Ct. 1769, 1784 (2009) (citing both

Wiggins and Rompilla in a case concerning an erroneous procedural ruling for the

general proposition that federal habeas review is not circumscribed by AEDPA's

deferential standards when a state court fails to adjudicate a claim's merits).

Moreover, it is wholly consistent with the Court's clear words from Richter:

> When a federal claim has been presented to a state court
> and the state court has denied relief, it may be presumed
> that the state court adjudicated the claim on the merits in
> the absence of any indication or state-law procedural
> principles to the contrary.
>     The presumption may be overcome when there is
> reason to think some other explanation for the state
> court's decision is more likely.

131 S. Ct. at 784–85 (emphasis added) (citations omitted).[17]

An application of the letter and spirit of this body of Supreme Court cases is

---

[17]  In this frame, the holdings of Wiggins and Rompilla are more relevant to this case than the holding of Richter—a decision that simply ratified our existing Circuit law.  This was not a Richter case, where the state court declined to articulate its rationale in order to conserve its valuable and finite resources.  This was an exceedingly high-profile case that prompted a great deal of attention and generated a great deal of controversy within the Florida DCA, not to mention ten different opinions from that en banc court.  The economic rationale driving Richter simply does not apply here.

preferable to the approach taken by the majority today. The rules we craft apply

with equal force to all habeas petitioners, including those under sentence of death.

In light of the nearly insurmountable deference to state court merits determinations

commanded by recent Supreme Court cases,[18] I cannot endorse an interpretation of

§ 2254(d) that prevents this Court from ordering relief in cases where a petitioner

has a meritorious constitutional claim, and we have an indication that the state

court did not previously adjudicate it.[19] We should to continue to apply the

intuitive logic of our current case law, represented by cases like Espy[20] and

---

[18] See, for example, Richter, speaking of § 2254(d)'s deferential standard of review:
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.

131 S. Ct. at 786 (citations omitted).

[19] The majority rule would prevent us from doing so in those cases where the petitioner has a meritorious claim, but the contrary conclusion would not be beyond fairminded disagreement. AEDPA commands us to respect those erroneous, but not unreasonable, state court judgments when the state court has previously adjudicated the claim. However, it would be unconscionable, and possibly unconstitutional, for us to allow a claimant to proceed to her execution when we have an indication that the state court did not actually address her claim.

Judges are only human. We make mistakes. And though, in the ordinary case, AEDPA itself provides a framework for relief from those mistakes within its structure of deferential review, that very structure is predicated upon the understanding that, prior to our review, every petitioner has had a full and fair de novo adjudication of her claims. It seems elementary that if, in the rare case, the mistake in question is of a kind that likely prevented the state court from actually adjudicating the merits of a claim, we must exercise plenary review. In such a case, the deferential standards of § 2254(d) have no place because there is no prior state court adjudication to which we can defer.

[20] 443 F.3d at 1364–65.

70

Romine,[21] if the facts of a case so demand. And in my mind, the facts of this case do just that.

It is clear to me, if not to this Court, that the majority of the Florida DCA was under the mistaken impression that if Junior's cross-examination was properly limited under Florida Rule 403, then there could be no violation of Childers's Sixth Amendment rights. This is a clear misunderstanding of federal law, even if those related, but independent, inquiries call upon a court to engage with similar facts and related bodies of law. The state court, therefore, failed to actually adjudicate the merits of Childers's Confrontation Clause claim. Consequently, when Childers properly presented that separate and independent claim for our review, it was, is, and should always remain, our constitutional duty to evaluate its merits to the best of our collective judgment.

A right without a remedy for its transgression is no right at all. No court whose opinion has not been vacated has given Childers unhampered consideration of his Sixth Amendment claim. AEDPA was meant to preclude a criminal defendant's second bite at the constitutional apple—not his first.

For this simple and important reason, I concur only in the majority's result.

---

[21] 253 F.3d at 1365.

BARKETT, Circuit Judge, dissenting in which MARTIN, Circuit Judge, joins:

I dissent from the majority's opinion in two respects. First, I do not agree that the state court adjudicated the merits of the federal Confrontation Clause claim that Childers raised, but rather treated it as a different state evidentiary rule claim. Therefore, as Judge Wilson also explains in detail in his concurring opinion, there is nothing to which a federal court can defer. Accordingly, the state court's decision is not subject to the deferential review required by 28 U.S.C. § 2254(d)(1), and Childers's federal constitutional claim must be reviewed de novo.

Second, viewing this record de novo, Childers was not afforded the fair trial guaranteed by the Sixth Amendment because he could not present crucial evidence that the State's star witness, Willie Junior, had fabricated the evidence against him. Knowing that Junior told different stories, without any evidence of Elliot's acquittal or the attempt to revoke Junior's plea agreement, merely permitted the jury to infer that Junior was a typical cooperating witness with an incentive to assist the State and that his inconsistent statements were simply the product of memory lapses. The Confrontation Clause requires the admission of evidence of bias if it leaves the jury with a "significantly different impression" of a witnesses's credibility. See Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986). Questions about the timing of Junior's changed testimony after the acquittal and attempted

72

revocation would have established the basis for an inference that Junior fabricated the additional evidence to ensure Childers's conviction and preserve his plea agreement, giving the jury a "significantly different impression" of his credibility. Thus, precluding all questioning violated Childers's Sixth Amendment rights. I address each of these points in turn.

I. Adjudication of the Merits of Childers's Confrontation Clause Claim

"When a federal claim has been presented to a state court and the state court has denied relief," we "presume[] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, ___U.S. ___, ___, 131 S. Ct. 770, 784-85 (2011) (emphasis added).[1] Thus, the presumption is overcome when state procedural law dictates or there otherwise exists "any indication" that the court did not reach the merits of the petitioner's federal claim. In other words, the presumption survives unless the petitioner can show "reason to think some other explanation for the state court's decision is more likely" than a merits adjudication of the federal claim. Id. at 785.[2] The Court likewise recognized in Early v. Packer that because a habeas

---

[1] Pursuant to 28 U.S.C. § 2254(d), a federal court may only grant habeas relief on those federal constitutional claims that have been adjudicated on the merits where the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

[2] The majority rewrites Richter to limit the broad phrase, "some other explanation for the state court's decision," to, "a state procedural bar." Maj. Op. at 27. This is not only on its face

73

petitioner's claim was "the same claim rejected on the merits in his direct appeal, . . . § 2254(d) was therefore applicable." 537 U.S. 3, 8 (2002) (per curiam). In this case, the state court decision adjudicating a different claim than the one Childers raised contains ample "reason to think some other explanation for the state court's decision is more likely," 131 S. Ct. at 785, and our prior precedent fully supports this position.

We have held, in accordance with the above-principles articulated in Richter and Packer, that state court decisions in which a state court treated and resolved a different claim than the one raised by the petitioner were not adjudications on the merits. Davis v. Sec'y for Dep't of Corr., 341 F.3d 1310 (11th Cir. 2003); Hammond v. Hall, 586 F.3d 1289 (11th Cir. 2009). Likewise, we have held that, where the state court simply failed to address the federal constitutional claim that the defendant raised, the court had not adjudicated the merits of the claim. Espy v. Massac, 443 F.3d 1362 (11th Cir. 2006).

In Davis, the petitioner raised an ineffective assistance of counsel claim in

---

contrary to the text, but would also read out of Richter the first half of the disjunctive, "any indication or state-law procedural principles." 131 S. Ct. at 785 (emphasis added). A plain reading of this text simply does not support the majority's limitation. And contrary to the majority's assertion, Maj. Op. at 28 n.16, nor does the context. For context, the majority relies on Richter's citation to Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (finding that the state court had applied a state-law procedural default rule). But Richter cited Ylst explicitly only as an example of a "reason to think some other explanation for the state court's decision is more likely" than an adjudication on the merits of the petitioner's claim. Richter, 131 S. Ct. at 785 (instructing readers to "[s]ee, e.g., Ylst v. Nunnemaker").

his state court post-conviction motion asserting that his counsel failed to preserve a Batson claim. 341 F.3d at 1313. The state court, however, misconstrued the petitioner's claim and instead adjudicated a different claim of ineffectiveness for failure to raise (not preserve) a Batson claim. Id. The Davis court concluded that the state court decision was not an adjudication on the merits of the same claim actually raised by the petitioner and, therefore, the petitioner's claim should be reviewed de novo. Id. Likewise in Hammond, we reviewed the petitioner's Brady claims de novo without applying AEDPA deference, having found that the state court treated the claims as alleging ineffective assistance of counsel and therefore had not adjudicated the merits of the Brady claims that the petitioner actually raised. 586 F.3d at 1306.

Similarly, in Espy, the petitioner raised two separate claims regarding the admissibility of certain hearsay statements, first that the hearsay statements did not fall within a Georgia hearsay exception and second that they violated his Sixth Amendment Confrontation Clause rights. 443 F.3d at 1364. The state court addressed the state evidentiary claim only and failed to address—in any way—the federal claim. Id. We held that the standard of review over the Confrontation Clause claim was de novo because the state court failed to adjudicate the merits of

that claim.  Id. at 1365.[3]

In this case, the state court adjudicated a different claim than Childers's

Confrontation Clause claim.  A Confrontation Clause analysis asks whether the

defendant "was prohibited from engaging in otherwise appropriate

cross-examination designed to show a prototypical form of bias on the part of the

witness, and thereby to expose 'to the jury the facts from which jurors . . . could

appropriately draw inferences relating to the reliability of the witness.'"  Van

---

[3] The majority today overrules our decision in Espy to the extent that we held that a
Confrontation Clause claim should be reviewed de novo because the state court failed to address
and resolve it while specifically addressing and resolving the defendant's other claims, including
a state-law hearsay claim.  Maj. Op. at 29 n.17.  The majority characterizes the state court's
opinion as having rejected petitioner's hearsay and Confrontation Clause claims while merely
failing to cite federal law.  But that court never rejected the Confrontation Clause claim and
instead listed out, addressed, and rejected all of the petitioner's claims but for the Confrontation
Clause claim.  Espy v. State, 539 S.E.2d 513 (Ga. App. 2000).

Overruling Espy is irreconcilable with these facts and with the Supreme Court's
decisions in Richter and Rompilla v. Beard, 545 U.S. 374 (2005).  Indeed, Espy is entirely
consistent with Richter because a state court decision that resolves fewer than all of the claims
that the petitioner raised, as in Espy, is a clear indication that the merits of the unresolved claims
have not been adjudicated, and therefore, the presumption that those claims were "adjudicated on
the merits" has been overcome.

Likewise, in Rompilla, the Supreme Court went so far as to consider whether the state
court had adjudicated the merits of both prongs of the petitioner's single ineffective assistance of
counsel claim.  545 U.S. at 390.  Having concluded that the state court adjudicated the merits of
the deficient-performance prong and that its resolution of that prong was an unreasonable
application of federal law, the Supreme Court went on to review the prejudice prong of the
petitioner's claim de novo because the state court never addressed that prong and there simply
was nothing in the state court's decision to which the Court could defer.  Id.  Similarly in Espy,
where the state court never addressed the second of the petitioner's two separate claims, we
properly reviewed that claim de novo because there was nothing in the state court's decision to
which a federal habeas court could give deference, just as there is nothing to which a court could
defer on the prejudice prong of an ineffective assistance of counsel claim where the state court
resolved the claim on only the deficient-performance prong.

Moreover, the majority's suggestion that dicta from Richter sub silentio overruled
Rompilla is both wrong and unnecessary. See Maj. Op. at 29-30 n.18.

76

Arsdall, 475 U.S. at 680 (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).  Our circuit has explained that "[t]he test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." United States v. Orisnord, 483 F.3d 1169, 1179 (11th Cir. 2007) (citation omitted); see also Van Arsdall, 475 U.S. at 680 (holding that the defendant in that case met his burden under the Confrontation Clause because his proposed line of questioning might have left the jury with a "significantly different impression" of the witness's credibility).

In the claim before the state court, Childers argued that his Confrontation Clause rights were violated because he was entirely foreclosed from presenting and arguing the basis of his theory that Junior had fabricated new evidence against him. Resolving that claim required an inquiry into whether a reasonable jury might have had a "significantly different impression" of Junior's credibility had Childers been permitted some questions about Elliot's acquittal and the attempted plea revocation to show motive to fabricate new and even more damaging statements.  The state court never addressed this question, and its treatment of the claim as one of a violation of Florida's state evidentiary rules gives ample "reason to think" that it did not resolve the federal constitutional claim.

First, the state court reviewed Childers's claim under an abuse of discretion standard. See Childers v. State, 936 So. 2d 585, 592 (Fla. Dist. Ct. App. 2006) ("We apply the abuse of discretion standard of review in reviewing the trial court's decision to exclude the evidence with which [Childers] sought to attack Junior's credibility."). Although Childers incorrectly claimed abuse of discretion review applied, a court must apply the correct standard of review regardless of the parties' arguments. The state court was fully aware that the proper standard for reviewing Confrontation Clause claims is de novo. See Milton v. State, 993 So.2d 1047, 1048 (Fla. Dist. Ct. App. 2008); McWatters v. State, 36 So. 3d 613, 637 (Fla. 2010). Thus, the court's review for abuse of discretion clearly indicates that it was not adjudicating Childers's Confrontation Clause claim.

Next, in discussing the exclusion of all evidence pertaining to the attempt to revoke the plea, the state court only weighed its probative value against its potential for undue prejudice under Florida's statute, § 90.403, which asks courts to weigh the probative value of relevant evidence against whether it is "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." But this weighing process does not involve the legal or factual analysis necessary to resolve a Confrontation Clause claim: that is, whether the evidence might have given a

78

reasonable jury a significantly different impression of a witness.[4]

With reference to the exclusion of all evidence pertaining to Elliot's acquittal, the state court conducted no analysis, constitutional or otherwise, stating only that verdicts from other cases are <u>typically</u> inadmissible under Florida law. Again, the state court never conducted the requisite inquiry as to whether some evidence exploring Junior's response to Elliot's acquittal was necessary to supply the basis for an inference that Junior was motivated to fabricate additional damaging testimony, giving the jury a different impression of his credibility. The state court did not resolve this Confrontation Clause claim. Rather it resolved a different claim—never raised by Childers—under a generally applied state practice having nothing to do with Childers's federal constitutional claim.

Under the Confrontation Clause, a court cannot exclude <u>all</u> evidence supporting a theory of defense on the basis that it is unduly prejudicial, regardless of whether a state evidentiary rule would permit it to do so. If a court determines that certain evidence might have left the jury with a significantly different impression of the witness's credibility, it must admit <u>some</u> of that evidence to support the defense theory, although it can limit the form and extent of it. Here,

---

[4] As Judge Wilson explains, the analysis would be different if the state law subsumed the relevant federal constitutional standard, as in <u>Early v. Packer</u>, 537 U.S. 3 (2002). Here, it does not, and thus the majority's reliance on the state court's discussion of evidentiary rules to find that the court adjudicated Childers's federal claim is misplaced.

79

the state court excluded <u>all</u> evidence without first inquiring whether it was necessary to reveal Childers's compelling defense theory of an additional motive and different bias. Failing to conduct this inquiry is another indication that the federal claim was not adjudicated.

For these reasons, the presumption that the state court adjudicated the merits of Childers's Confrontation Clause claim has been overcome. <u>See</u> <u>Richter</u>, 131 S. Ct. at 784-85; <u>Hammond</u>, 586 F.3d at 1306; <u>Davis</u>, 341 F.3d at 1313.

II. <u>Childers's Rights Under the Confrontation Clause</u>

The Sixth Amendment's Confrontation Clause commands that the reliability of evidence "be assessed in a particular manner: by testing in the crucible of cross-examination." <u>Crawford v. Washington</u>, 541 U.S. 36, 61 (2004). Cross-examination serves not only to reveal a witness's perceptions and memory but also to expose his "biases, prejudices, or ulterior motives." <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974); <u>accord</u> <u>Van Arsdall</u>, 475 U.S. at 678-79. The Supreme Court has explained that a defendant's rights under the Confrontation Clause are violated if the excluded testimony would have provided the jury with a "significantly different impression of the witness' credibility had defense counsel been permitted to pursue his proposed line of cross-examination." <u>Olden v. Kentucky</u>, 488 U.S. 227, 232 (1988) (quoting <u>Van Arsdall</u>, 475 U.S. at 680) (brackets omitted)).

While a trial court may impose reasonable limits on cross-examination to protect such concerns as harassment, prejudice, confusion of the issues, or repetition, Van Arsdall, 475 U.S. at 679, those limitations cannot be so comprehensive that they intrude on the defendant's constitutional right to confrontation, see Olden, 488 U.S. at 232. Thus, a trial court cannot exercise its discretion to control cross-examination in such a way that a defendant is completely precluded from presenting his theory regarding all of a witness's biases, prejudices, or ulterior motives. See Davis, 415 U.S. at 317 (concluding that, as the only judges of a witness's credibility, "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [a witness's] testimony").

In accordance with Supreme Court precedent, our circuit has reiterated that while a trial court's evidentiary ruling "is entitled to a great deal of deference," this discretion is narrower (due to constitutional concerns) where the "court limits a defendant's right to cross-examine witnesses against him." United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992) (citation omitted); accord United States v. Crumley, 565 F.2d 945, 949 (5th Cir. 1978) ("A trial court's sound discretion . . . must give due regard to the Sixth Amendment's right of

81

confrontation." (emphasis added)).[5]

In this case, Childers was completely precluded from cross-examining Junior about any evidence from which the jury could have inferred that Junior fabricated his new damaging statements and had not merely "forgotten" relevant facts. Based on the cross-examination that Childers was permitted, the jurors heard that Junior had a plea agreement, requiring him to give truthful and complete statements, pursuant to which he had given nine sworn statements to investigators and had testified consistent with those statements at Elliot's trial. The jury also learned that those statements were different from Junior's testimony in Childers's case. On this permitted cross-examination, a reasonable jury could have drawn two plausible inferences: (1) that Junior was a garden-variety cooperating witness who had a motivation to help the State in order to preserve his plea agreement; and (2) that although inconsistent, both sets of Junior's testimony (the first ten and his Childers's trial testimony) were truthful and complete as best as Junior could recall at the time he gave them.

What the jury did not know was that Elliot was acquitted and that it was only after Elliot's acquittal that Junior met twice more with investigators and changed

---

[5] The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

his story, specifically adding damning testimony against Childers that he had never mentioned <u>ten</u> previous times. Before Elliot's acquittal, Junior said Childers had not made any statements; after Elliot's acquittal, he testified that Childers had made incriminating statements. In seeking to revoke Junior's plea agreement, the State recognized that the added facts were inconsistent with his prior nine statements and with his testimony at Elliot's trial. The State chose to accept his new statements as true and his earlier statements as "incomplete and/or untruthful," which violated the plea agreement terms and which harmed the prosecution's cases against Elliot and Childers. Thus, Junior knew that the State expected him to use the new statements against Childers and was also aware of the possibility of a second attempt at revocation if he reverted back to his earlier statements. While Childers's cross-examination about Junior's inconsistent statements may have diminished Junior's credibility, the damage was distinct from Childers's theory of Junior's completely different and new motivation to fabricate more damaging statements. Believing that a witness has now recalled additional facts, or even generally favors one side, leaves a jury with a much less damaged and different impression than if the jury believed that the witness was motivated to intentionally fabricate specific pieces of incriminating evidence. Childers had a right under the Confrontation Clause to present some evidence to support this theory.

Although the trial court retained discretion to limit the questioning about these events, it could not bar all questioning about Junior's state of mind and the motivation for his new testimony deriving from the acquittal of Elliot and the State's subsequent attempt to revoke his plea agreement. See Van Arsdall, 475 U.S. at 679 ("By thus cutting off all questioning about . . . event[s] that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony [or for lying], the court's ruling violated [the defendant's] rights secured by the Confrontation Clause.").

The ability to explore the motivations behind the testimony of a witness is at the heart of what the Confrontation Clause is meant to protect. See Davis, 415 U.S. at 318 ("While counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked the degree of impartiality expected of a witness at trial."). The lines of questioning that Childers wished to explore had the potential to expose additional and independent motivations for Junior's change in testimony that could have significantly crippled his credibility with the jury. But this theory and the evidence supporting it were hidden from the jury. As the sole judges of Junior's credibility, "the jurors were entitled to have the

84

benefit of [Childers's] defense theory before them so that they could make an informed judgment as to the weight to place on [Junior's] testimony which provided a crucial link in the proof of [Childers's] act." Davis, 415 U.S. at 317 (alteration and quotation marks omitted).

Moreover, in its own deferential review under AEDPA, the majority erroneously treats the holdings of Davis, Van Arsdall and Olden as dicta. In Van Arsdall, the Court explained that

> a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

475 U.S. at 679 (quoting Davis, 415 U.S. at 318). The Court held that the defendant there had met this burden because "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination." Id. at 680; accord Olden, 488 U.S. at 232; Orisnord, 483 F.3d at 1179. The majority suggests this holding is dicta because it "could be read to require far more extensive questioning than simply regarding the existence of

bias."[6]  Maj. Op. at 42.  By treating this holding as dicta, the majority says that it is free to define "bias" in such a way as to greatly limit the topics of cross-examination:

> The relevant issue, then, is how broadly or narrowly we should define each "source" of bias.  A narrower definition of "sources" would create more topics about which trial courts <u>must</u> permit cross-examination, and would correspondingly constrict a trial court's discretion to limit cross-examination.  A broader concept of "sources" would have the opposite effect, creating fewer required topics of cross-examination and increasing the trial court's discretion.

Maj. Op. at 49.  Thus, opting to define Junior's bias broadly, the majority concludes that Childers's Confrontation Clause rights were not violated because "[q]uestioning about the plea agreement exposed the jury to Junior's relevant bias—his relationship with the State as the State's witness.  The Notice of Revocation and the Elliot acquittal were merely individual manifestations of that same bias."  Maj. Op. at 50.  Accordingly, Junior's "bias" was adequately exposed.

The effect of the majority's view that the Confrontation Clause is satisfied by allowing some questions about a witness's broadly defined bias is the inevitable exclusion of all evidence about another event that supports a witness's different

---

[6] Of course, concern that the Supreme Court's holding is broader in scope than we believe to be prudent does not transform that holding into dicta.  By its own terms, this holding protects the right to question about events or circumstances that would result in a motivation, knowledge of which might significantly affect a reasonable juror's credibility determination.  It is hard to see what is so "extensive" or unreasonable.

86

motivation to testify in a particular way because that evidence can somehow be categorized as part of the broadly defined bias.  This approach, however, cannot be reconciled with Van Arsdall's holding that a court cannot "prohibit[] all inquiry into the possibility that [the witness] would be biased" as a result of "an event that . . . a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony."  475 U.S. at 679 (latter emphasis added).  A witness's inclination or even specific intention to favor the prosecution, i.e. to give testimony that is damaging to the defendant, can be motivated by various circumstances, each of which could have its own distinct impact on the jury's impression of that witness.  Under the majority's phrasing, if it can be shown that a witness is cooperating with the government under a plea agreement, the trial court can exclude evidence of a romantic relationship or financial arrangement between the witness and a state actor because the "bias," i.e. the witness's "relationship with the State," has already been exposed.  The majority's rule would find no constitutional right to confront the witness about these other "relationships" even though they could be compelling evidence of another and different motive—related to, but not derived from, the original plea agreement—to testify in a particular way.[7]  This is a much too cramped view of excluding evidence under the

---

[7] Even the majority recognizes that our decision in United States v. Lankford, 955 F.2d 1545, 1548-49 (11th Cir. 1992), held that the defendant had a Confrontation Clause right to

87

Confrontation Clause. Where a defendant identifies evidence that would support a motive that could significantly influence the jury's impression about a witness's credibility in a way that an already exposed "bias" does not, a defendant has a right under the Confrontation Clause to ask some questions about the evidence that supports that motivation. Accordingly, in this case, although the plea agreement showed that Junior had a general bias to assist the State, the questions about Elliot's acquittal and the attempted revocation, contrary to the majority's assertion, would not have merely manifested that same general bias. Rather the evidence Childers wanted to present would have revealed something very different—Junior's motive to intentionally make up additional, more incriminating and false statements against Childers, that could have eviscerated Junior's credibility.

---

cross-examine the prosecution's witness about two different biases: the witness's incentive to lie because of his son's arrest for drug possession and (2) the witness's bias that derived from his plea agreement with the prosecution. The majority, however, is not bound to apply this circuit precedent because of its finding, discussed in Part I, that § 2254(d) deference applies.